## HORNBLOWER & WEEKS-HEMPHILL NOYES v. ARTHUR B. LAZERE.

222 N. W. 2d 799.

October 25, 1974—No. 44556.

*Gray, Plant, Mooty & Anderson* and *Daniel R. Shulman,* for appellant.

464

*Meagher, Geer, Markham, Anderson, Adamson, Flaskamp &
Brennan, J. Richard Bland,* and *O. C. Adamson II,* for respondent.

MacLaughlin, Justice.

In November 1968, defendant, Arthur B. Lazere, established a cash account for the purchase and sale of stock with plaintiff, Hornblower & Weeks-Hemphill Noyes, a stockbrokerage house. Laurence Orrick, a stockbroker-employee, was plaintiff's agent for defendant's account. Business was transacted at plaintiff's Minneapolis office, but the stock which defendant purchased was kept by plaintiff with defendant's permission at its home office in New York. As a cash customer, rather than a margin customer, defendant was obligated to promptly pay plaintiff in full for all stock that plaintiff purchased for his account. The record discloses that defendant engaged in substantial trading in the account with both "buy" and "sell" orders. It further discloses that defendant had engaged in heavy trading in previous accounts with other brokers and that he had traded as much as $500,000 worth of stock in 1 year.

On January 9, 1969, defendant called Orrick and inquired about the status of his account. Orrick checked with plaintiff's Chicago office and was informed that defendant had a credit balance in his account in excess of $4,000. Upon learning this, defendant requested that plaintiff send him a check for $4,000, and a draft was sent to him in that amount on January 9, 1969.

On February 4, 1969, defendant again called Orrick and inquired about the account. Again Orrick checked with the Chicago office and was advised that defendant had a credit balance in excess of $4,000. Having been informed of this, defendant requested that another $4,000 check be delivered to him, and a draft in that amount was sent to him on February 4, 1969.

At all times relevant to this case, plaintiff had a policy of not making cash payments to customers with accounts showing debit balances. Approximately a week or 10 days after the February

4 payment of $4,000, plaintiff discovered that both the January 9 and February 4 payments had been erroneously made while defendant had a debit balance of approximately $700 in his account. After Orrick contacted defendant, told him about the errors, and requested defendant to return the $8,000 and to pay the debit balance, defendant told Orrick that he would not pay the $8,700 because he had relied upon the mistaken payments and had made business commitments based upon that money. Defendant later testified at trial that if he had not been misled by plaintiff as to the amount of money in his account he would have sold some of his stock to meet his financial obligations. Defendant stated that between the time he received the mistaken payments and the time plaintiff demanded the return of those payments, his stock suffered a decrease in value in excess of $9,000.

Shortly after plaintiff sought the return of the $8,000, defendant requested plaintiff to turn his stock certificates over to him. From February 1969 until the return of his stock in mid-1970, defendant continued to demand that plaintiff deliver his stock certificates to him. Finally, in mid-1970, plaintiff did deliver the certificates to defendant.

After Orrick initially requested that defendant pay the debit balance and defendant refused, Orrick contacted defendant several times and recommended that he sell certain stocks in his account which were declining in value. However, because Orrick had informed defendant that the proceeds of any such sale would be offset against the debit balance, defendant refused to authorize such sales.

After returning the stocks, plaintiff commenced this action to recover the $8,000 mistakenly paid to defendant. Defendant asserted in his answer that the mistaken payments by plaintiff caused him to refrain from selling stock which he owned which was being held by plaintiff and which declined in value at least equal to the amount of his indebtedness to plaintiff. Defendant also counterclaimed for damages for conversion of his stock by

plaintiff, alleging that plaintiff wrongfully refused to return his stock upon demand and that while plaintiff illegally withheld the stock it decreased in value by approximately $40,000. The jury returned a verdict which found that defendant had sustained damages of $4,125 as a result of plaintiff's mistaken payment to him of $8,000. The jury also awarded defendant $18,000 on his counterclaim. Thereafter, the trial court found that plaintiff was entitled to judgment against defendant for the difference between the mistaken payment of $8,000 and $4,125 or $3,875, and that defendant was entitled to judgment against plaintiff in the amount of $18,000. The trial court determined that the verdicts should be offset against each other and that defendant was entitled to judgment against plaintiff in the amount of $14,125, together with interest from and after February 26, 1969, the date defendant requested return of the stock, in the amount of $3,390, for a total of $17,515, together with his costs and disbursements. We reverse and remand for a new trial on the question of damages only.

Several issues are presented for our consideration: (1) Whether that portion of the verdict can be sustained which awards defendant $4,125 on his affirmative defense that plaintiff's negligent mispayment of the $8,000 caused him to forbear selling stock in his account which thereafter declined in value; (2) whether defendant's stock was converted by plaintiff or whether plaintiff rightfully refused to deliver defendant's stock because it had a valid general lien over all of defendant's stock in its possession securing the debit balance of $700 or securing the mistaken payment of $8,000; (3) whether defendant made a proper request for the delivery of his stock upon a person with authority to make such a delivery; and (4) whether the trial court erroneously instructed the jury on the measure of damages in a stock conversion case.

■ Defendant alleged that plaintiff's mispayment to him of the $8,000 caused him to forbear selling stock that he otherwise would have sold, which declined in value between the time that

the mispayment was made and the time plaintiff demanded that defendant return the $8,000. In its special verdict the jury found that plaintiff's mistaken payment had been the direct and proximate cause of damage to defendant in the amount of $4,125. Plaintiff takes issue with this finding and argues that the trial court erred in refusing to grant its motion for a judgment n.o.v. because the evidence does not support the jury's finding that defendant suffered damages as a result of the erroneous payment.

While we are of the opinion that the two $4,000 payments were negligently made by plaintiff to defendant, we agree with plaintiff that the evidence does not support a finding that defendant suffered damages directly caused by the negligent payments. As a general rule, damages which are speculative, remote, or conjectural are not recoverable. Austin v. Rosecke, 240 Minn. 321, 61 N. W. 2d 240 (1953) ; Carpenter v. Nelson, 257 Minn. 424, 101 N. W. 2d 918 (1960). Although defendant alleged that the negligent payment caused him to forbear selling stock which later declined in value, he was unable at trial to state specifically what stock he would have sold, and on what date he would have sold it, had he been informed of the correct state of his account. Moreover, defendant actually did make several trades, including two trades to cut losses on falling stock, between the time that the first erroneous payment was made and the date upon which plaintiff discovered the mistaken payments and asked defendant to return the $8,000.

Therefore, since it would have been impossible for the jury to have determined with any accuracy what stocks defendant would have sold and on what date, and because it appears that defendant continued to make trades during the period in question, we hold that the evidence, viewed in the light most favorable to the verdict, is too speculative to afford a reasonable basis for that portion of the verdict granting damages to defendant for plaintiff's negligent mispayment of the $8,000. It was error to deny plaintiff's motion for judgment n.o.v. on this point, and the

award of $4,125 to defendant cannot stand. See, Ford v. Stevens, 280 Minn. 16, 157 N. W. 2d 510 (1968).

■ Plaintiff contends that the trial court erred in refusing to set aside that portion of the verdict which found that plaintiff converted defendant's stock by refusing to deliver it to defendant within a reasonable time after defendant demanded that the stock be delivered to him. The jury found that defendant sustained $18,000 in damages as a result of that conversion.

Plaintiff points out that defendant's monthly statement for the period ending February 25, 1969, shows a debit balance of $8,746.30. Plaintiff states that of the $8,746.30 no more than $8,000 could be attributed to the mistaken payments to defendant. Therefore, plaintiff argues that defendant had a debit balance of $746.30 in his account for stock purchased but not paid for at the time he demanded the return of his stock. Plaintiff maintains that because of the $746.30 debit balance, representing monies due on stock purchased for defendant's account, it acquired a general lien over all of the stock in defendant's account and could thereby rightfully withhold delivery of the stock upon defendant's request without being liable for conversion.

We have carefully reviewed the pertinent authorities on this issue and have concluded that there is no merit in plaintiff's position.

In Brown, Law of Personal Property (2 ed.) § 109, the following is found:

"* * * The general lien * * * exists only when separately contracted for, when conferred by statute, or more commonly when, according to the usage or custom of a particular trade or calling, a general lien is so common and so well established that the parties to the particular transaction in question must be taken to have made their contracts in relation to such usage or custom. While the specific lien has often been declared to be a favorite of the common law, the general lien on the other hand is regarded somewhat as an unwelcome stepchild. In certain call-

ings, indeed, such as those of the attorney, banker, factor, and innkeeper, the general lien is now well established and made a part of the common law. Attempts, however, to extend in the courts such liens to other callings have not met with success. The question in each case is essentially one of fact: Is the claimed custom in a general trade so well established that it must be considered part of a contract between the parties? The burden of establishing the lien by custom is on the party claiming it. The mere opinion of members of a particular trade to the effect that they should have a lien, proof of isolated instances of the claim and enforcement of a lien, or proof that a lien exists in other localities, are insufficient."

The evidence and the applicable case law do not establish a custom in the stockbrokerage business of encumbering stock held in a cash account with a general lien to secure the unpaid purchase price of other shares of stock. The rule is that a broker can obtain a general lien only when he has advanced funds toward the purchase of stock in a margin transaction. See, Pizer v. Hunt, 250 Mass. 498, 146 N. E. 7 (1925); Hammon v. Paine, 56 F. 2d 19 (1 Cir. 1932); see, also, Restatement, Security, § 12. When securities are purchased on margin, the customer may, among other things, furnish a portion of the purchase price while the broker furnishes the remainder. In Austin v. Hayden, 171 Mich. 38, 50, 137 N. W. 317, 322 (1912), the Michigan Supreme Court said:

"Though there are cases expressing a different view, we think it established by the great weight of authority that the customer buying on *margin* becomes owner of the stock, although the broker who has purchased it for him can hold it as a pledge for advances made in obtaining it. If the stock so purchased becomes thereafter worth more or less than the purchase price, the gain or loss is that of the customer, who is also entitled to credit for any dividends which may accrue thereon. The relation of the parties is pledgor and pledgee; the broker's ultimate rights in

the stock being limited to the money he had advanced to purchase the same, with interest, and his commissions for transacting the business, in which he is protected by the partial payment the customer has made and the stock which he holds in pledge." (Italics supplied.)

However, when the account is a cash account, the broker does not have a general lien against the customer's shares held by the broker. Henry B. Warner & Co. Inc. v. McCormick, 89 Pa. D. & C. 251 (1954). This rule was stated in Meyer, The Law of Stockbrokers and Stock Exchanges, § 65, p. 314, as follows:

"If the broker is carrying for the customer only a single marginal account, his lien is a general one, existing against all of the securities of the customer in his possession. In such a case all stocks carried in the account, whether purchased by the broker for the customer or whether deposited by the customer in the first instance, stand as security for the customer's general indebtedness. That is in accordance with the intention of the parties as expressed by their words or conduct, and is in conformity with usual stockbrokerage practice. However, if the broker is carrying two or more marginal accounts for the same customer, or a marginal and a cash account, the question of the generality of the lien cannot be answered with such certainty. * * * On principle it would seem that whether or not under such circumstances the broker's lien is a general one should depend on the intention of the parties. What intention would be inferred, in the absence of a definite expression, must be regarded as an open question.

"But whatever the extent of the broker's lien may be in the absence of an expression of intention, it is clear that the lien is not a general one where, from all of the circumstances, such a lien was not within the contemplation of the parties. * * * Moreover, the lien does not extend to securities which have been bought by the customer and paid for by him outright, or which have been deposited by the customer for the purpose of cash sale,

in the absence of a specific agreement subjecting them to the lien."

Because the account in the present case was a cash account, and because there was no agreement between plaintiff and defendant granting a general lien to plaintiff against defendant's shares, the trial court was correct in rejecting plaintiff's argument that such a lien existed,[1] either because of the $746.30 balance representing stock purchased but not paid for or because of plaintiff's $8,000 negligent mispayment.

■ Similarly, there is no merit to plaintiff's contention that defendant's demand for the return of his stock was improper because defendant demanded the return from Orrick, who plaintiff claims lacked authority to effect the return. It is undisputed that as early as February 1969 defendant requested Orrick to return his stock to him. Orrick testified that the normal procedure upon receiving such a request was to transmit the request to the wire operator who passed it on through the proper channels. Apparently, neither plaintiff nor Orrick ever advised defendant that Orrick was not a proper person to receive a demand for the return of stock.

Defendant argues that Orrick either had implied authority or apparent authority to receive such a request. Implied authority is actual authority which includes such powers as are directly connected with and essential to the business specifically entrusted to an agent. Apparent or ostensible authority is not actual authority but is that authority which the principal holds

---

[1] One remedy that is available to a stockbrokerage house where a customer does not pay for stock purchased for a cash account is a "sell-out" under Regulation T, 12 CFR § 220.4(c) (1963), of the Federal Reserve Board, promulgated pursuant to §§ 7, 8, and 29 of the Securities Exchange Act of 1934, 15 USCA, §§ 78g, 78h, and 78cc (1970). This regulation provides that if a cash account customer does not make full cash payment for securities purchased within 7 days after the date of purchase the brokerage house must liquidate those shares for which no payment has been made.

the agent out as possessing or knowingly permits the agent to assume. Derrick v. The Drolson Co. Inc. 244 Minn. 144, 69 N. W. 2d 124 (1955); Hockemeyer v. Pooler, 268 Minn. 551, 130 N. W. 2d 367 (1964); Duluth Herald & News Tribune v. Plymouth Optical Co. 286 Minn. 495, 176 N. W. 2d 552 (1970).

Upon the facts of the present case, we hold that Orrick had either implied or apparent authority to receive a demand for the return of defendant's stock. All of defendant's business with plaintiff had been conducted through Orrick, and defendant was never advised that Orrick was unable to handle his request for the return of his stock. Therefore, the trial court was correct in refusing to rule that defendant failed to request the return of his stock from a person having the requisite authority to return it.

Thus, since plaintiff did not have a valid general lien against defendant's stock, and since defendant made a proper request for the return of his stock, plaintiff's failure to return defendant's stock was properly found by the jury to be a conversion of defendant's stock. Breuer v. Continental Ins. Co. 188 Minn. 112, 246 N. W. 533 (1933); Hildegarde, Inc. v. Wright, 244 Minn. 410, 70 N. W. 2d 257 (1955).

■ Plaintiff also assigns as error the trial court's instruction to the jury regarding the measure of damages in a stock conversion case. The trial court instructed on damages as follows:

"Now, the measure of damages in a case of this kind; that is, for the withholding of stock, if there is to be a recovery, is the difference between the highest market value of that stock on the day in which demand for its return is made, and its value on the day when it is eventually returned. The highest value in the intervening period is the measuring stick which you will use in determining that. The highest value between the date upon which demand is made and the date upon which the stock is eventually returned. That is the measuring stick that you will use."

Plaintiff vigorously argues that it was error for the trial court to instruct that damages were to be computed by taking the dif-

ference between the value of the stock on its return and the highest value that it achieved between the date of conversion and the date of its return. While that measure of damages is not without some precedential support, it is not considered by the majority of courts to be the most appropriate yardstick to calculate damages in a stock conversion case. See, Annotation, 31 A. L. R. 3d 1286.

However, the rule used by the trial court is somewhat similar to the so-called New York rule, which holds that the measuring value to be used in calculating damages in a stock conversion case is the highest market value that the stock reaches within a reasonable time after the owner has knowledge of the conversion. Annotation, 31 A. L. R. 3d 1286, 1322. The purpose for the reasonable time period is to give the investor an opportunity to decide whether and at what price he should buy replacement stock for the converted stock.[2] 31 A. L. R. 3d 1332. If the New York rule was used in the present case, the measure of damages would be the difference between the value of the stock when it was returned to defendant and the highest value that the stock achieved within a reasonable time after defendant had reason to know that plaintiff refused to return his stock.

Minnesota has never established a definitive rule regarding the measure of damages for the conversion of stock. However, after studying the various alternatives, we agree with plaintiff that the New York rule provides the fairest award of damages to both the victim and the perpetrator in a case involving the conversion of property, such as stock, which is subject to rapid fluctuations in price. Hence, we adopt the New York rule as the proper method to be used to calculate damages in this case.

---

[2] It should be noted that the typical stock conversion case is one in which stock is sold without authority. This explains the rationale behind allowing the investor under the New York rule a reasonable opportunity to consider purchasing replacement stock for the converted stock. However, we believe the rationale applies equally to a case where the conversion is accomplished by refusing to relinquish stock upon proper demand of the owner.

We therefore reverse and remand for a new trial on damages. On remand it will be necessary for the finder of fact to determine both the date upon which defendant had reason to know that plaintiff refused to return his stock and the highest value achieved by the stock within a reasonable time after that date.

In determining what is a reasonable time, no maximum and minimum limits have been established. In Mayer v. Monzo, 221 N. Y. 442, 117 N. E. 948 (1917), the New York Court of Appeals stressed this point and said that under varying circumstances findings of 15, 30, or 60 days had been sustained as a reasonable period of time. Therefore, we conclude that the most important question to be considered by the trier of fact in determining the reasonable period of time is what amount of time is necessary to allow the owner of the stock a reasonable opportunity to consult counsel, to employ other brokers, and to watch the market in order to determine whether and at what price to repurchase other stocks in place of those converted. Burhorn v. Lockwood, 71 App. Div. 301, 75 N. Y. S. 828 (1902), appeal dismissed, 177 N. Y. 539, 69 N. E. 1121 (1903) ; Mayer v. Monzo, *supra*; Gelb v. Zimet Brothers, Inc. 34 Misc. 2d 401, 228 N. Y. S. 2d 111 (1962), affirmed, 18 App. Div. 2d 967, 237 N. Y. S. 2d 989 (1963).

Finally, we hold that interest may be recovered on any damages which are awarded on retrial for the conversion of defendant's stock. It has long been the law of this state that in conversion cases the measure of damages may include interest as a matter of right from the date of conversion. Carlson v. Schoch, 141 Minn. 236, 170 N. W. 195 (1918) ; Sittauer v. Alwin, 151 Minn. 508, 187 N. W. 611 (1922). Furthermore, interest is almost invariably awarded as part of the damages for stock conversion. See, Annotation, 31 A. L. R. 3d 1286, 1301; 18 Am. Jur. 2d, Conversion, §§ 99, 100. Therefore, we hold that interest may be awarded on any damages determined to be recoverable under the New York rule from the date that defendant had reason to know that plaintiff refused to return his stock.

Because we are remanding this case for a new trial on damages, we need not consider other points raised by the parties on this appeal.

Reversed and remanded for a new trial on damages consistent with this opinion.