Robert R. VANDERBEEK; William C. Bacon; and Dorothy Severson, in their capacity as co-trustees on behalf of the James W. Vanderbeek Generation–Skipping Transfer Trust UTA6–21–82 Tax ID No. 7012717, Petitioners,

v.

VERNON CORPORATION, a British West Indies Corporation, Respondent.

No. 00SC960.

Supreme Court of Colorado, En Banc.

June 17, 2002.

Rehearing Denied Aug. 5, 2002.

Wehrle Law Firm, P.C., Richard T. Wehrle, Denver, Colorado, Attorney for Petitioners.

Martin & Mehaffy, LLC, Joel C. Maguire, Boulder, Colorado, Attorney for Respondent.

Justice RICE delivered the Opinion of the Court.

We granted certiorari to consider the appropriate test for recovery of consequential damages in actions alleging tortious economic interference.[1] Relying on our decision in *Colorado Kenworth Corp. v. Whitworth*, 144 Colo. 541, 357 P.2d 626 (1960), the court of appeals concluded that consequential damages for wrongful attachment were recoverable only if at the time the tort was committed, both parties contemplated such damages as the probable result thereof, and these damages were not uncertain, unnatural, remote as to cause, speculative, or conjectural. Because the court of appeals concluded that the consequences of Petitioners' wrongful attachment were within the "reasonable contemplation" of the parties at the time the tort was committed, it awarded Respondent the "use value" of the unlawfully detained funds. It denied Respondent the "lost profits value" of these funds though, because this value was not reasonably ascertainable.

We affirm the court of appeals' judgment. In doing so, however, we clarify that the proper test for assessing consequential damages arising from economic torts is whether such damages are the natural and probable result of the injury sustained by virtue of the tortious act. As in other torts, these damages must be proximately caused by the tortious act and be reasonably ascertainable. Here, we hold that (1) an increase in the price Respondent paid to acquire 95,000 shares of Osicom Technologies, Inc. ("Osicom"), and (2) Respondent's inability to purchase an additional 105,000 shares of Osicom stock were the natural and probable result of Petitioners' wrongful attachment. In addition, we hold that the Petitioners' wrongful attachment of Respondent's funds was the proximate cause of such damage. Finally, we hold that the increased cost of acquiring 95,000 shares of Osicom stock is reasonably ascertainable and therefore recoverable. However, the lost profits on 105,000 shares of Osicom stock not purchased because of the

wrongful attachment is not reasonably ascertainable and thus not recoverable. We therefore affirm the court of appeals' judgment.

## I.  FACTS AND PROCEDURAL HISTORY

Petitioners, Robert R. Vanderbeek, William C. Bacon, and Dorothy Severson, in their capacity as co-trustees on behalf of the James W. Vanderbeek Generation–Skipping Transfer Trust, brought an action in Boulder County District Court against Respondent, Vernon Corporation, and others arising out of a partnership agreement among the parties. In conjunction therewith and pursuant to C.R.C.P. 102, Petitioners moved ex parte for issuance of a pre-judgment writ of attachment against approximately $1,000,000 they expected to be paid into the account of Respondent at Firststate Bank. In reliance on Petitioners' representations, the trial court granted the motion, and on December 23, 1997, a Writ of Attachment was served on Firststate Bank. Firststate then froze $1,023,370 in Respondent's account.

In response, Respondent traversed the writ of garnishment issued in aid of attachment. At the traverse hearing, the trial court concluded that a forum selection clause in a partnership agreement between the parties deprived it of subject-matter jurisdiction over the action. Accordingly, on January 13, 1998, it dismissed the action and dissolved the writ.

Subsequently, Respondent filed a motion seeking damages it claimed were caused by the wrongful attachment of its funds. According to the stipulation of facts submitted to the trial court by the parties, Respondent intended to use $450,000 of the funds frozen by the writ of garnishment to purchase 200,000 shares of Osicom. Petitioners had no actual knowledge of this intent. On December 24, 1997, the day after the writ was issued, shares of Osicom were trading at $2⁹⁄₁₆ per share. Thus, on this date, Respondent could have acquired 200,000 shares of Osicom

1.  The precise issue on which we granted certiorari was framed as:

Whether the court of appeals erred by applying a standard for assessment of economic tort

damages that is in conflict with the decision of the Colorado Supreme Court in *Colorado Kenworth Corp. v. Whitworth*, 144 Colo. 541, 357 P.2d 626 (1960).

for approximately $436,000 plus commission. Respondent was unable to purchase Osicom until the funds were released however. By this time, the stock had appreciated considerably such that Respondent was only able to obtain 95,000 shares for a cost of $449,828.15.

Respondent claimed damages in the amount of $331,015.65. This figure represented the additional $242,728.15 it had to pay for the 95,000 shares of Osicom it did purchase plus $88,287.50 in lost profits on the 105,000 shares of Osicom it was unable to purchase. The trial court refused to award either component. It reasoned that Osicom's dramatic rise in value between December 23, 1997 and January 13, 1998 was unforeseeable and thus damages attributable thereto were merely speculative or conjectural. Instead, it held that the appropriate measure of damages was the interest on the principal amount of the funds during the time they were frozen.

The court of appeals reversed in part. It acknowledged that "[o]rdinarily, the measure of damages for tortious detention of money is the legal rate of interest for the period of such detention." *Vanderbeek*, 25 P.3d at 1245 (citing *Boyle v. Poor*, 62 Colo. 337, 163 P. 967 (1916)). However, it correctly held that consequential damages might also be recovered. *Id.* (citing *Colo. Kenworth Corp. v. Whitworth*, 144 Colo. 541, 357 P.2d 626 (1960)). It therefore turned its attention to the test for determining when consequential damages are available.

The court of appeals recognized that "[d]amages resulting from wrongful attachment are governed by tort principles" and that "[g]enerally in an action for tort, an injured party is entitled to recover damages for the natural and probable consequences of the tort." *Vanderbeek*, 25 P.3d at 1244. However, the court of appeals read *Colorado Kenworth Corp.* as requiring it to apply the more limited standard for recovery of consequential damages derived from *Hadley v. Baxendale*, 9 Ex. 341, 156 Eng. Rep. 145 (1854). *Id.* at 1244–45. It therefore held that consequential damages for wrongful attachment are recoverable " 'if under the circumstances, it can be fairly said that both

parties have these consequences in contemplation at the time of the wrong complained of, as the probable result thereof, and if these unusual consequences are neither uncertain, unnatural, nor remote as to cause, nor speculative and conjectural in effect.' " *Id.* at 1245 (quoting *Colo. Kenworth Corp.* 144 Colo. at 549, 357 P.2d at 631–32). Applying this test, the court of appeals held that "it was within the reasonable contemplation of the parties that the money attached was to be used for investment purposes of some kind." *Id.* at 1246. It therefore awarded as consequential damages the additional cost Respondent paid for the 95,000 shares of Osicom. *Id.* It denied the profits lost on the 105,000 shares of Osicom Respondent never purchased, however, because these damages were not reasonably ascertainable. *Id.* at 1246–47.

We affirm the court of appeals' judgment, but for a different reason.

## II. ANALYSIS

Because we disagree with the court of appeals that *Colorado Kenworth Corp.* resolves the issue before us, we begin with an analysis of that case.

### A. *Colorado Kenworth Corp.*

The parties in *Colorado Kenworth Corp.* entered into a sales agreement for the purchase of a "truck-tractor." 144 Colo. at 542, 357 P.2d at 628. The purchaser, Whitworth, made an initial payment and agreed to pay the balance in seventeen successive monthly payments. *Id.* He gave a note for this balance secured by a chattel mortgage on the truck-tractor. *Id.* Whitworth purchased the truck-tractor for the purpose of hauling freight, and Kenworth, the seller, knew this. *Id.* at 549, 357 P.2d at 631. Due to a dispute between the parties, Kenworth repossessed the truck. *Id.* at 544–45, 357 P.2d at 629. Whitworth claimed that this repossession was wrongful and brought suit. *Id.* at 545, 357 P.2d at 629. The parties stipulated at a pretrial conference that the action was founded on a theory of conversion. *Id.* As part of his damages, Whitworth claimed consequential damages resulting from his inability to

perform a freight-hauling contract with a third party. *Id.*

On appeal this court articulated the relevant issue before it in this way: "Are consequential damages recoverable in a conversion action, or is the plaintiff restricted to a recovery of the value of the article taken with interest on such value." *Id.* at 549, 357 P.2d at 631. Thus, the issue on appeal as framed by the court was not the standard by which the recovery of consequential damages are to be determined but simply whether they are recoverable at all in a conversion action.

The court founded its analysis of this issue on an initial premise: that Kenworth knew Whitworth purchased the truck-tractor for the purpose of hauling freight. *Id.* It then cited both of the competing standards for recovery of consequential damages in a tort action involving purely economic interference. *Id.* First, the court acknowledged that conversion is a tort and thus "Kenworth should be answerable to such damages as will completely indemnify Whitworth for the natural and probable consequences of its conversion." *Id.* Under this standard, whether consequential damages are recoverable depends only on a determination that these damages were proximately caused by the wrongful act and that they are reasonably ascertainable. Then, the court cited the rule derived from *Hadley v. Baxendale* for recovery of special damages[2] in a contract action: "Damages flowing from a conversion which are not ordinary, usual, or commonly to be expected are recoverable 'if, under the circumstances, it can fairly be said that both parties have these consequences in contemplation at the time of the wrong complained of, as the probable result thereof, and if these unusual consequences are neither uncertain, unnatural, nor remote as to cause, nor speculative

and conjectural in effect.' " 144 Colo. at 549, 357 P.2d at 631–32 (quoting *Cannon v. Oregon Moline Plow Co.,* 115 Wash. 273, 197 P. 39, 41 (1921)).

Under either a tort or a contract standard, the foreseeability of the consequences is a factor. However, the test derived from *Hadley* imposes a more restrictive foreseeability limitation. To be recoverable under the *Hadley* test, consequential damages must be so likely that "it can fairly be said" both parties contemplated these damages as the probable result of the wrong at the time the tort occurred. Under the tort standard, damages need only be reasonably foreseeable.

Importantly, because Kenworth knew Whitworth purchased the truck-tractor for the purpose of hauling freight, the consequential damages Whitworth claimed satisfied even the more restrictive *Hadley* standard of foreseeability. Thus, it was not necessary for the court to decide between the two tests, and it never did. After reciting both tests, it simply concluded that lost profits resulting from a conversion of property are recoverable.[3] 144 Colo. at 549, 357 P.2d at 632. Accordingly, we do not read *Colorado Kenworth Corp.* as deciding whether a tort or a contract measure of damage should govern the recovery of consequential damages in an economic tort action. We therefore address this issue now.

## B. The Appropriate Measure of Damage for Economic Torts

Central to our determination of the appropriate measure of damage is a determination of the nature of the duty breached in economic torts. Where the duty breached stems from a contract, redress must be un-

**2.** In the context of economic torts, consequential damages and special damages are synonymous. Either term "refers to damages consequent upon but distinct from harm to the plaintiff's entitlement." 1 Dan B. Dobbs, *Dobbs Law of Remedies* § 3.3(4), at 302 (2d ed.1993). To the extent that *Colorado Kenworth Corp.* can be read as distinguishing between special and consequential damages we reject such a construction.

**3.** Of the two cases cited by *Colorado Kenworth Corp.* in support of the proposition that lost prof-

its are recoverable in a conversion action, one applies the *Hadley* standard and one applies the traditional tort standard for recovery of consequential damages. In all, *Colorado Kenworth Corp.* cites six cases in its discussion of this issue. Two apply the tort standard, two apply the *Hadley* standard, and two permit the recovery of consequential damages in a conversion action without any discussion of the appropriate standard.

der the contract, and the rule derived from *Hadley* is the appropriate standard by which to assess the consequential damages of the breach. However, where a duty arises independently of any contractual obligations between the parties, a tort action will lie, and consequential damages should be assessed under traditional tort standards.

■ We have recently had occasion to fully examine the boundary between contract and tort law in upholding the validity of the economic loss rule. *See Town of Alma v. Azco Constr., Inc.*, 10 P.3d 1256 (Colo.2000). In *Town of Alma*, we explained that "[t]he essential difference between a tort obligation and a contract obligation is the source of the duties of the parties." 10 P.3d at 1262. Tort law is designed to protect all citizens from the risk of harm to their persons or their property. *Id.* Accordingly, tort duties are generally imposed by law "without regard to any agreement or contract." *Id.* Contract obligations, in contrast, arise from promises between the parties. *Id.*

The rationale behind *Hadley v. Baxendale's* contract measure of damages demonstrates why it is an inappropriate standard for assessing consequential damages when the duty breached arises independently of any agreement between the parties. The *Hadley* rule is designed to further a fundamental principle of contract law: parties must be able to confidently allocate risks and costs during their bargaining without fear that unanticipated liability may arise in the future, effectively negating the parties' efforts to build these cost considerations into the contract. Under *Hadley*, a party to a contract is only responsible for those damages that he should reasonably have contemplated as the probable result of a breach at the time the contract was entered into. Because the party is aware, or should be aware, that these damages are a potential consequence of breach, he presumably will take into account the risk that these contingencies will occur while negotiating the contract. Thus, by limiting contractual liability to those damages foreseen by the parties at the time the contract was formed, *Hadley* ensures that the bargain struck reflects a mutually agreeable allocation of the risks and costs of breach. In other words, *Hadley* guarantees the fairness of a bilateral agreement by protecting the parties from unanticipated liability arising in the future.

■ But a tortious act is a unilateral invasion of a right taken "without regard to any agreement or contract." *Town of Alma*, 10 P.3d at 1262. The victim of a tort has no opportunity to negotiate with the tortfeasor—no opportunity to allocate the risk that a particular consequence will occur or evaluate the cost if it should. Therefore, whether he reasonably contemplated a particular consequence as the probable result of the tort at the time it occurred is irrelevant. *Cf.* 22 Am.Jur.2d, *Damages* § 454 (2001) ("The distinction between damages in tort and damages for breach of contract is not a mere matter of form, since a party to a contract is given the legal option to perform or pay damages, and in order to allow the party to evaluate his options in a meaningful way, one who breaks a contract is liable only for those damages which one could reasonably anticipate.").

■ Accordingly, the rule derived from *Hadley* is inapplicable in tort actions where the duty breached arises independently from any agreement between the parties. *See* Restatement (Second) of Torts § 917 cmt. d (1979) (stating that while the limitation in actions for breach of contract [that the harm must be such as the contract breaker should reasonably foresee at the time of making the contract to be within the risk of occurrence as a result of his breach] does not ordinarily apply to the extent of liability in tort, it may apply in cases in which the basis of the tort is the failure of the defendant to perform the obligations of a consensual relation with the other). Economic interference through wrongful attachment is a tort that recognizes the existence of a duty independent of any contractual obligations. Therefore, although the conduct necessary to commit this tort involves purely economic interference, any damages resulting from wrongful attachment are nevertheless governed by tort principles. *Stensvad v. Towe*, 232 Mont. 378, 759 P.2d 138, 144 (1988) (permitting the plaintiff in a wrongful attachment action to recover $5,000 for loss of income under tort principles).

Accordingly, we hold that the appropriate measure of the damages a victim of wrongful attachment may recover is such damage as is "the natural and probable result of the injury sustained by virtue of the tortious act." [4] *Thompson v. Tartler*, 166 Colo. 247, 255, 443 P.2d 365, 369 (1968); *see also McNeill v. Allen*, 35 Colo.App. 317, 325, 534 P.2d 813, 818–19 (1975) (rejecting *Hadley* standard and awarding plaintiffs damages for loss of a favorable interest rate on a home they intended to purchase in a fraud action because the victim of a tort "may recover such damages as are the natural and probable result of the injury sustained by virtue of a tortious act"). As is the case in other tort actions, the recovery of these damages is limited by the requirements that such damages be proximately caused by the tortious act, and that they be reasonably ascertainable.

## C. The Tortious Act Must Proximately Cause The Consequential Damages

■■■ In torts involving interference with contract and economic opportunity "[m]ost courts award damages under tort principles ... with damages limits based upon proximate cause rather than contemplation of the parties." Dan B. Dobbs, *The Law of Torts*, § 455, at 1297 (2000) [hereinafter *Law of Torts*]; *see also Dean v. James McHugh Constr. Co.*, 56 A.D.2d 716, 392 N.Y.S.2d 946, 948 (N.Y.App.Div.1977) (holding that there is "no reason why a party who is wrongfully deprived of the use of his funds may not recover damages representing more than the legal interest rate, provided that he can prove that such damages were actually sustained as a proximate result of the deprivation"). "Under this view, the plaintiff can recover all proximately caused damages, including consequential damages, even if those damages were greater than the damages the plaintiff could recover against [a] contract breacher." *Law of Torts, supra*, § 455, at 1297. The proximate cause standard requires only that the damages be "reasonably foreseeable." *Ekberg v. Greene*, 196 Colo. 494, 496–97, 588 P.2d 375, 376–77 (1978); *see also Walcott v. Total Petroleum, Inc.*, 964 P.2d 609, 611 (Colo.App.1998) ("[F]oreseeability is the touchstone of proximate cause."); *cf.* C.J.I.-Civ.3d 9:30 ("The negligence, if any, of the defendant ... is not a cause of any ... damage ... to the plaintiff ... unless injury to a person in the plaintiff's situation was a reasonably foreseeable consequence of that negligence."). "The exact or precise injury need not have been foreseeable, but it is sufficient if a reasonably careful person, under the same or similar circumstances, would have anticipated that injury to a person in the plaintiff's situation might result from the defendant's conduct." C.J.I.-Civ.3d 9:30. Thus, although broader than *Hadley*, proximate cause serves as a very real limit on liability. Melvin Aron Eisenberg, *The Principle of Hadley v. Baxendale*, 80 Calif. L.Rev. 563, 567 (1992) ("[T]he choice between a regime based on *Hadley v. Baxendale* and a regime based on proximate cause is not a choice between liability for foreseeable losses and liability for all losses

---

4. C.R.C.P. 102 does not modify the damages recoverable in an action for wrongful attachment. *See Crowley v. Hardman Bros.*, 122 Colo. 489, 498, 223 P.2d 1045, 1049 (1950) (holding that the Colorado Rules of Civil Procedure do not "attempt to affect the substantive rights of litigants"). Respondent argues, and we agree, that under C.R.C.P. 102, damages for wrongful attachment are governed by tort principles. We disagree, however, with Respondent's understanding of those principles. Respondent argues that because wrongful attachment is a tort, Petitioners are liable for any damages resulting therefrom, regardless of how remote or unforeseeable these damages may be. Under this rule, even speculative or conjectural damages would presumably be recoverable. We cannot justify a rule that would impose liability for remote and unforeseeable injuries connected to the tortious act only through a disjointed and extended chain

of causation. The unlimited liability imposed by such a broad rule is inconsistent with the policy that a tortfeasor should be held responsible and the victim compensated, but only for the kinds of harms within the risk created by his conduct. In accordance with this goal, proximate cause excludes from the appropriate scope of responsibility harms resulting from the tortfeasor's conduct that are so clearly outside the risk created by his conduct that it would be unjust or at least impractical to impose liability therefor. *See generally Law of Torts, supra*, Ch. 10. Thus, as Respondent concedes at one point in its brief to this court, C.R.C.P. 102 "contains an inherent element of foreseeability." *See* C.R.C.P. 102(n)(2) ("A plaintiff who fails to prevail at the hearing provided for by this section is liable to the defendant for any damages sustained as a result of the issuance of process, costs, and reasonable attorney's fees.").

caused in fact. Rather it is a choice between competing standards of foreseeability ....". In sum, because damages resulting from wrongful attachment are governed by tort principles, proximate cause is the appropriate standard by which to assess their extent.

## D. Damages Must Be Reasonably Ascertainable

Whether *Hadley* or proximate cause serves to limit liability for consequential damages, a plaintiff must prove the damages he has suffered with reasonable certainty. Dobbs, *supra*, § 6.6(2), at 137. "When the issue of causation is resolved, the question is whether the evidence of loss ... contains sufficient certainty and proximity upon which to base an award of special or consequential damages." *Cope v. Vermeer Sales & Serv. of Colo.*, 650 P.2d 1307, 1309 (Colo. App.1982). "The purpose of the reasonable certainty rule is to avoid making compensatory damages awards for lost profits which are fabricated or based on mere conjecture or speculation." *Nora v. Safeco Ins. Co.*, 99 Idaho 60, 577 P.2d 347, 350 (1978) (internal quotations omitted). The rule only applies to situations where the fact of damages is uncertain, not where the amount is uncertain. *Peterson v. Colo. Potato Flake & Mfg. Co.*, 164 Colo. 304, 310, 435 P.2d 237, 239 (1967).

*Hornblower v. Lazere*, 301 Minn. 462, 222 N.W.2d 799 (1974), provides a relevant application of this rule. In that case, the defendant alleged in his counterclaim that by mispaying him $8,000, the plaintiff had caused him to forbear selling stock that he otherwise would have sold. *Hornblower*, 222 N.W.2d at 803. This stock declined in value between the time that the mispayment was made and the time the plaintiff demanded that defendant return the $8,000. *Id.*

Citing the rule that speculative, remote or conjectural damages are not recoverable, the Minnesota Supreme Court held that an award of damages could not be sustained on this basis. *Id.* It noted that "[a]lthough defendant alleged that the negligent payment caused him to forbear selling stock which later declined in value, he was unable at trial to state specifically what stock he would have sold, and on what date he would have sold it,

had he been informed of the correct state of his account." *Id.* Accordingly, the court reasoned that "since it would have been impossible for the jury to have determined with any accuracy what stocks defendant would have sold and on what date, ... we hold that the evidence, viewed in the light most favorable to the verdict, is too speculative to afford a reasonable basis for that portion of the verdict granting damages to defendant for plaintiff's negligent mispayment of the $8,000." *Id.*

With these principles in mind, we turn to the merits of the case at hand.

## III. APPLICATION

The parties are former partners who had an established business relationship. Not only did Petitioners know the approximate amount of money Respondent was transferring into the state, they knew precisely when this transfer would take place, and at what bank. Furthermore, the parties stipulated that Respondent intended to use the funds frozen by the writ of garnishment to purchase 200,000 shares of Osicom. Given these undisputed facts, we hold that the damages sought by Petitioner are the natural and probable result of the injuries they sustained by virtue of the tortious act. In addition, although Petitioners had no actual knowledge that Respondent intended to purchase Osicom, it was reasonably foreseeable that the money attached was to be used for investment purposes of some kind. Likewise, it was reasonably foreseeable that attachment of the funds would prevent, or at least delay, such an investment and cause damage thereby. Accordingly, we hold as a matter of law that Petitioners' wrongful attachment of Respondent's funds proximately caused: (1) an increase in the price Respondent paid to acquire 95,000 shares of Osicom stock; and (2) Respondent's inability to purchase an additional 105,000 shares of Osicom stock. *See Pioneer Constr. Co. v. Richardson*, 176 Colo. 254, 259, 490 P.2d 71, 74 (1971) (holding that the question of proximate cause is for the court in the absence of conflicting testimony); *see also Lyons v. Nasby*, 770 P.2d 1250, 1256 (Colo.1989) (holding that "where reasonable minds can draw but one inference from the

evidence," the question of proximate cause becomes one of law); *Samuelson v. Douthirt,* 187 Colo. 155, 160, 529 P.2d 631, 634 (1974) (holding that the question of "proximate cause [is] for the court where the evidence, and the inferences to be drawn therefrom, are such that reasonable men, giving fair consideration thereto, must reach the same conclusion").

We now turn our attention to whether the damages claimed by the Respondent are reasonably ascertainable. First, we consider Respondent's claim that it had to pay a higher price to acquire 95,000 shares of Osicom stock as a result of Petitioner's wrongful attachment. It is undisputed that, at the time of attachment, Respondent intended to buy 200,000 shares of Osicom stock and had earmarked a certain sum of money for this purpose. Because these funds were frozen, however, it was unable to purchase Osicom stock until approximately one month later when the writ of garnishment was released. Since the price of Osicom stock increased dramatically while the funds were frozen, Respondent was able to purchase only 95,000 shares of Osicom with the money it had set aside to purchase 200,000 shares. These facts are reasonably ascertainable from the parties' stipulation.[5]

We approve of the court of appeals' assessment of this element of the consequential damages claimed by Respondent:

[D]espite the trial court's conclusion that "money [can] be put to innumerable uses," an identifiable portion of the wrongfully attached money here had been set aside for a particular purpose. Accordingly, defendant is entitled to ... the additional amount paid for the 95,000 shares ... of the wrongfully attached $450,000 that he had intended to spend, and indeed, did spend on Osicom stock.

*Vanderbeek,* 25 P.3d at 1246. Because the increase in the price Respondent paid to acquire 95,000 shares of Osicom stock is a reasonably ascertainable consequential damage of Petitioners' wrongful attachment, it is recoverable. Accordingly, we affirm the court of appeals' judgment awarding Respondent the increase in the price it paid to acquire 95,000 shares of Osicom stock.

In contrast, whether, and to what extent, Respondent lost profits on the 105,000 shares he never purchased is speculative and conjectural. Generally, damages based on lost profits are disfavored when the venture from which the projected profit is derived is speculative or conjectural. *Lee v. Durango Music,* 144 Colo. 270, 278, 355 P.2d 1083, 1087 (1960) (holding that a claim for future profits may not be sustained by evidence which is speculative, remote, imaginary, or impossible of ascertainment); *Milheim v. Baxter,* 46 Colo. 155, 103 P. 376 (1909); *see also* Restatement (Second) of Torts § 912 cmt. f (1979) (requiring that an injured party have a "substantial and measurable chance of a profit without chance of loss" to satisfy the requirement of "certainty"). As the trial court pointed out, "stock trading is a gambler's business, the very nature of which is speculative and conjectural."

Profits from a stock investment are not realized until the stock is sold at a higher price than that at which it was bought. These 105,000 shares of Osicom stock were neither bought nor sold. Thus, unlike the increased cost Respondent actually paid to acquire the 95,000 shares of Osicom, determining the profits Respondent could have realized had he purchased the 105,000 shares of Osicom the day after the earmarked funds were frozen is entirely dependent on an arbitrarily chosen "sell" date.

On December 24, 1997—the day after Respondent's earmarked funds were frozen—Osicom stock was trading at $2¾₆ per share. Subsequent to this date, the value of Osi-

---

5. According to that stipulation: On December 24, 1997, the day after the writ was issued, Respondent could have acquired 95,000 shares of Osicom stock for $207,100. Respondent ultimately paid $449,828.15 for 95,000 shares of Osicom in January of 1998 after the writ was released. Hence, because of Petitioners' wrongful attachment of its funds, Respondent Vernon Corporation had to pay an additional $242,728.15 in order to obtain 95,000 shares of Osicom stock. Therefore, not only is the additional amount paid for the 95,000 shares reasonably ascertainable, it is "a concrete figure that [can] be calculated given the time frame and the differences in the price of the stock." *Vanderbeek,* 25 P.3d at 1246.

com's stock has varied tremendously. Adjusted to reflect a reverse split of the stock on a one for three basis that Osicom completed on July 24, 1998, it has ranged from $1⅞ to $19½ according to the parties' stipulation. Respondent chose to calculate profits lost on the 105,000 shares they were unable to purchase as a result of Petitioners' wrongful attachment based on the value of Osicom stock on November 30, 1998—the day before the trial court hearing on this issue. On this date, Osicom stock closed at $9⅜₆ per share. Accordingly, Respondent claimed the difference in value between Osicom's stock on this date and its value the day after the earmarked funds were frozen, or $88,287.50, as the profits it had lost.[6] If Respondent had instead chosen the date on which Osicom stock was trading at $19½ per share, its "lost profits" would have been much more. In contrast, if lost profits had been measured from the date that Osicom was trading at 1⅞, Respondent would not have been damaged at all. This uncertainty precludes an award of damage for lost profits. *Cf. Hornblower*, 222 N.W.2d at 803 (holding that although plaintiff caused defendant to forbear selling stock which later declined in value, damages therefor were too speculative to be recovered because defendant was unable at trial to state specifically what stock he would have sold, and on what date he would have sold it). We therefore affirm the court of appeals' judgment denying Respondent lost profits on the 105,000 shares of Osicom stock it was unable to purchase because of Petitioners wrongful attachment.

## IV. CONCLUSION

We hold that consequential damages are recoverable in torts of economic interference, such as the wrongful attachment here. As in any other tort action, the appropriate measure of the damage a victim of an economic tort may recover is that amount which is the natural and probable result of the injury sustained by virtue of the tortious act. In order to be recoverable, such damages must be proximately caused by the tortious act and must be reasonably ascertainable.

Given the undisputed facts in this case, we hold that the damages sought by Petitioner are the natural and probable result of the injury they sustained by virtue of the tortious act. In addition, we hold that Petitioners' wrongful attachment of Respondent's funds was the proximate cause of: (1) an increase in the price Respondent paid to acquire 95,000 shares of Osicom stock; and (2) Respondent's inability to purchase an additional 105,000 shares of Osicom stock. The increased cost of acquiring 95,000 shares of Osicom stock due to the wrongful attachment is reasonably ascertainable and therefore recoverable. However, the lost profits on 105,-000 shares of Osicom stock not purchased because of the wrongful attachment is not reasonably ascertainable and therefore not recoverable. We therefore affirm the court of appeals judgment. We remand the case to the court of appeals to return it to the trial court to recalculate the Respondent's damages consistent with this opinion.

Justice BENDER dissents.

Justice BENDER, dissenting:

The majority engages in a cogent and well-reasoned discussion of the law of consequential damages for economic torts. However, because I believe that it is not necessary to consider this area of the law and because I disagree with the majority's conclusion that lost profits cannot be recovered in this case as a matter of law, I respectfully dissent.

In my view, the question in this case is not what damages are available when an economic tort occurs. Instead, the question we must address is what damages are authorized by Colorado Rule of Civil Procedure 102(n)(2).

The authority of a court to issue a prejudgment writ of attachment is entirely statutory. *Worchester v. State Farm Mut. Auto. Ins. Co.*, 172 Colo. 352, 354, 473 P.2d 711, 712 (1970); *Gurley v. Tomkins*, 17 Colo. 437, 447, 30 P. 344, 348 (1892); *Tekai Corp. v. Transamerica Title Ins. Co.*, 39 Colo.App. 528, 534,

---

**6.** Respondent's calculation of the profits it claims to have lost takes into account the 3 to 1 reverse stock split that occurred on July 24, 1998.

571 P.2d 321, 326 (1977). The writ of attachment is an extraordinary remedy which was unknown at common law. *Worchester,* 172 Colo. at 354, 473 P.2d at 712; *Great West Mining Co. v. Woodmas of Alston Mining Co.,* 12 Colo. 46, 54, 20 P. 771, 775 (1888); *see also* 7 C.J.S. *Attachment* § 3(a), at 228 (1980 & Supp.2001) ("Attachment as it exists in the United States today is deemed to be a summary and extraordinary remedy in derogation of the common law and has been said to owe its existence entirely to statutory enactment."). Attachment permits a party, ex parte and without notice to the affected individual, to deprive that individual of control over her property. *See* C.R.C.P. 102(a). Because it is such an unusual remedy, and because it does have the potential to cause significant hardship to the person whose property is attached, the situations in which it may be used are extremely limited. *See* C.R.C.P. 102(c); *see also* Graham Susman, *Seizure of Person or Property: Rules 101–104,* 23 Rocky Mtn. L.Rev. 603, 605 (1951) ("As a safeguard and protection to the defendant who is usually first apprised of the attachment after the deed is done, there are certain essential steps which must be complied with as a prerequisite to the issuance of the writ."). Abuses must be carefully guarded against in order to protect defendants, who have not yet been afforded an opportunity to present evidence or to be heard by the court, from injury.

Historically, many jurisdictions created a tort, known as "wrongful attachment," to compensate for the injury that resulted when plaintiffs abused the statutory attachment procedure. Certain elements, somewhat analogous to the tort of malicious prosecution, were often required in order for an individual to succeed with a wrongful attachment claim. *See, e.g., Gurley,* 17 Colo. at 446–47, 30 P. at 348; 7 C.J.S. *Attachment* § 394; 8 Stuart M. Speiser et al., *The American Law of Torts,* § 28:37, at 235–36 (1991). Thus, such a tort claimant was often required to prove both that the plaintiff's use of the writ of attachment was "malicious" and that the plaintiff lacked "probable cause" to believe that he was entitled to such an attachment. *See, e.g., Gurley,* 17 Colo. at 446–47, 30 P. at 348; 7 C.J.S. *Attachment* § 394.

In many states today, a statute or rule has replaced the common law action for wrongful attachment. *See, e.g., Tekai,* 39 Colo.App. at 534, 571 P.2d at 326 (stating that the statute or rule of procedure that creates and defines the remedy of attachment also "govern[s] the cause of action arising out of a wrongful attachment"); 7 C.J.S. *Attachment* § 394. Thus, in states where such a statute or rule exists, it often becomes unnecessary for courts to consider common law tort principles when deciding whether and what amount of damages should be awarded to the victim of a wrongful attachment. *See* 6 Am. Jur.2d *Attachment and Garnishment* § 604 (1999) ("Generally, statutory provisions govern a cause of action arising as a wrongful attachment.") (citing *Tekai,* 39 Colo.App. at 534, 571 P.2d at 326). When the language of the statute or rule is plain and unambiguous, it is to be applied as written and it is unnecessary to resort to extrinsic sources to determine the meaning of the rule or statute. *See, e.g., J.P. Meyer Trucking & Constr., Inc. v. Colo. Sch. Dists. Self Ins. Pool,* 18 P.3d 198, 201 n. 5 (Colo.2001); *Watson v. Fenney,* 800 P.2d 1373, 1375 (Colo.App.1990) (stating that rules of statutory construction apply to the interpretation of rules of procedure).

In Colorado, C.R.C.P. 102(n)(2) defines the circumstances in which damages are recoverable for a wrongful attachment. Specifically, this rule provides that a defendant who prevails in a hearing where he objects to a writ of attachment against his property is entitled to any damages resulting from the attachment:

> A plaintiff who fails to prevail at the hearing provided by this section is liable to the defendant for *any damages sustained as a result of the issuance of process,* costs, and reasonable attorney's fees.

C.R.C.P. 102(n)(2) (emphasis added). C.R.C.P. 102 was enacted pursuant to this court's constitutional rule-making authority and, like all rules, has the force and effect of statute. *See* Colo. Const. art. VI, § 21; *Knudson v. Frost,* 51 Colo. 340, 341, 117 P. 157, 157 (1911) ("The rules of the court have the force and effect of a statute.").

The Colorado rule departs from the common law in two major respects. First, the rule contains no requirement that the attachment be "malicious" or that the plaintiff had "probable cause" to believe that she would win her suit. In deciding whether to award damages, the only question that the court must answer is whether the defendant prevailed at the hearing traversing the affidavit. Second, and most importantly, the rule requires that the defendant be awarded "any" damages sustained, without limitation to the traditional sorts of damages available in tort suits.

For the above reasons, C.R.C.P. 102(n)(2) departs significantly from the common law rules that governed the tort of wrongful attachment. The majority, however, assumes that tort principles control and does not examine the specific language of the Colorado rule.

In my view, the language of C.R.C.P. 102(n)(2) is clear and unambiguous. The rule states that the defendant is entitled to "any damages sustained as a result of the issuance of process." I see no need to analogize to the tort of conversion, or to any other sort of economic or non-economic tort, to determine the proper measure of damages. The purpose of the rule is to protect the defendant, who through no fault of his own has become the victim of a prejudgment, ex parte attachment. Thus, I conclude that the rule means what it says and that the injured defendant can recover any damages that he can prove.

The majority's conclusion that the defendant in this case cannot recover a portion of his damages, $88,287, is but an application of the rule that the defendant must prove his damages. In the majority's view, it is impossible, as a matter of law, for the defendant to prove that he sustained a loss of $88,287 on

the stocks that he was unable to purchase as a result of the plaintiff's attachment of his funds. I disagree with this conclusion.

The following facts are undisputed. The plaintiff attached the defendant's money, approximately $450,000 of which had been earmarked for the purchase of 200,000 shares of Osicom stock. This attachment occurred in December of 1997.[1] The money was not released for the defendant's use until one month later, in January of 1998, when the defendant successfully traversed the plaintiff's affidavit. At that time, the Osicom stock had dramatically appreciated in value. The defendant immediately used the released money to purchase Osicom stock, the purpose for which he had originally intended it. However, $450,000 was no longer enough money to obtain 200,000 shares, so the defendant purchased the number of shares that he could then afford: 95,000 shares.[2]

Just one week after the writ of attachment was dissolved, the defendant moved for an award of damages pursuant to C.R.C.P. 102(n)(2). Eleven months later, in December of 1998, a hearing was held on the defendant's motion.

The parties stipulated that, at the time of the hearing, the defendant continued to hold the 95,000 shares that he had purchased when the writ of attachment was dissolved in January of 1998. No evidence was taken at this hearing. The defendant divides his damages into two categories: (1) the increased cost of purchasing 95,000 shares of stock in January of 1998; and (2) the lost profits on the 105,000 shares of stock that he was not able to purchase, as measured from the date of the damages hearing in Decem-

---

1. From the record, it appears that, after the writ was issued, the plaintiff was ordered to post a bond of $200,000 but never did so. C.R.C.P. 102(d), which relates to the requirement that the plaintiff post a bond, reiterates the rule of damages found in C.R.C.P. 102(n)(2):

   Before the issuance of a writ of attachment the plaintiff shall furnish a bond ... in an amount set forth by the court ... to the effect that if the defendant recover judgment, or if the court shall finally decide that the plaintiff was not entitled to an attachment, the plaintiff will pay

   all costs that may be awarded to the defendant, and *all damages defendant may sustain by reason of the wrongful suing out of the attachment.* C.R.C.P. 102(d) (emphasis added). However, because it is not clear from the record whether the court required the plaintiff to post a bond before the writ was issued, I rely on the language of C.R.C.P. 102(n)(2) for this dissent.

2. By my calculations, 200,000 shares would have cost approximately $950,000 at the time the writ was dissolved.

ber of 1998.[3]

The majority concludes that the first category of damages sought by the defendant is reasonably ascertainable but that the second category is not. I agree with the majority regarding the 95,000 shares of stock that the defendant did purchase. However, I disagree with the majority's conclusion that damages based on the lost profits suffered by the defendant on the 105,000 shares that he was unable to purchase are speculative as a matter of law.

The stipulated facts of this case reveal that the plaintiff's actions in obtaining a writ of attachment resulted in financial loss to the defendant. The defendant was going to make a very particular investment and that investment would have paid off. It is true that we do not know when the defendant would have sold the 105,000 shares that he was unable to buy because of the attachment. Thus, we do not know exactly the amount of profit that the defendant might have ultimately realized from his investment, or whether he would have continued to own the relevant 105,000 shares in December of 1998. It is important to consider the likely reason why we do not know this information.

We are deciding this case on stipulated facts that do not provide a complete picture.[4] The defendant was never given an opportunity to testify or to present evidence as to whether or when he intended to sell the 200,000 shares that he originally planned to purchase. We do not know whether he planned his Osicom investment to be a short term or a long term one, or how the attachment affected his decision to purchase or sell the smaller number of shares that he was subsequently able to afford when the attachment was lifted. We do not know if he would have retained the 200,000 shares as a block, to be sold all at once.[5] Had the defendant been given an opportunity to present evidence on the damages question, we might not need to speculate regarding when the defendant would have sold the stock or the amount of lost profits that he suffered.

Further, I note that the majority's decision has the effect of punishing the defendant for the trial court's delay in reaching the damages issue. The more time that passes between attachment and calculation of damages, the more speculation there will be about whether the defendant would have continued to own the shares of Osicom stock. Presumably, the defendant would have received full damages had the trial court immediately considered the issue of damages upon release of the attachment and the receipt of the defendant's motion.

Because I believe that it is possible for the defendant to prove that he sustained damages in the amount of the lost profits that he seeks, I would remand this case for consideration of that issue.

---

3. A simpler and more logical approach would be to award the defendant the difference between the value of the assets that he had when the money was attached (approximately $450,000) and the value of the assets that he would have had when the attachment was lifted (approximately $950,000). The defendant, however, does not advocate for this approach. I note that this approach assumes that the defendant would be able to prove that he would not have sold the stock during the interim month between the issuance of the writ of attachment and its release.

 The majority focuses upon the fact that the appreciation of stock is not realized until the stock is sold. While true, this does not change the fact that at the time of attachment, the defendant had something that was worth approximately $450,000 that would have, absent the attach-

ment, been worth approximately $950,000 when the attachment was lifted.

4. The majority relies on *Hornblower & Weeks–Hemphill Noyes v. Lazere*, 301 Minn. 462, 222 N.W.2d 799 (1974), to support its conclusion that lost profits of the sort sought here are speculative as a matter of law and, therefore, may not be recovered. However, as the majority acknowledges, the *Hornblower* decision explicitly rests on the ground that the defendant had an opportunity to prove his damages and simply failed to do so. 222 N.W.2d at 803. The defendant has been given no such opportunity in this case.

5. If so, then his continued ownership of the 95,000 shares might be indicative of the fact that he would have also continued to own the other 105,000 shares.