2013 CO 49

**Lynda S. GIBBONS, Brent Wilson, and Gibbons–White, Inc., a Colorado corporation, Petitioners**

v.

**Gregory T. LUDLOW, S. Reid Ludlow, and Jean E. Cowles, Respondents**

**Supreme Court Case No. 11SC899**

Supreme Court of Colorado,
En Banc.

July 1, 2013

Rehearing Denied Aug. 5, 2013*

* Justice Coats and Justice Boatright would grant the Petition.

Attorneys for Petitioners: Balaban, Levinson & Costigan, P.C., Kenneth L. Levinson, Cherami Ball Costigan, Bernadette J. Wasilik, Denver, Colorado.

Attorneys for Respondents: Cooper & Clough, P.C., Paul D. Cooper, Jeremy L. Swift, Denver, Colorado, Hensley & Kennedy, P.C., John F. Hensley, Boulder, Colorado.

JUSTICE RICE delivered the Opinion of the Court.

¶ 1 In this transactional broker professional negligence case, we hold that to sustain a professional malpractice claim against a transactional real estate broker, a plaintiff must show that, but for the alleged negligent acts of the broker, he either: (1) would have been able to obtain a better deal in the underlying transaction; or (2) would have been better off by walking away from the underlying transaction.

¶ 2 Here, the plaintiff Sellers failed to present evidence of the fact of damages because they do not establish beyond mere possibility or speculation that they suffered a financial loss because of the transactional brokers' professional negligence. Because no injury could be shown, the trial court properly granted summary judgment as a matter of law.

## I. Facts and Procedural History

¶ 3 In 2000, Gregory T. Ludlow, S. Reid Ludlow, and Jean E. Cowles (collectively the "Sellers") entered into an exclusive listing agreement with the real estate brokerage firm Gibbons–White, Inc., for the sale of approximately 131 acres of vacant land in Boulder County. Over the next seven years, the Sellers received offers from at least three different buyers to purchase portions of the land; however, none of the offers resulted in a completed sale. Then, on February 21, 2007, Actis, LLC, a real estate investment business, made an offer to purchase 49.2 acres of the land for $6,439,910. As pertinent to this appeal, the offer contained the following provision:

Reimbursement Agreement:

On or before sixty (60) days following the Mutual Execution of this Contract, Seller shall provide Buyer with a proposed cost-sharing and reimbursement agreement ("Reimbursement Agreement") relating to shared utilities, road and infrastructure for the Property. This Contract shall terminate unless a mutually acceptable Reimbursement Agreement is placed into escrow with the Title Company on or before the Resolution Deadline. If the Parties are unable to successfully agree to accept-able terms and execute the Reimbursement Agreement on or before the Resolution Deadline, Buyer's Earnest Money shall be refunded to Buyer in full, pursuant to the provisions of Section 2(b) of this Contract Addendum, without penalty. *Buyer's proportionate share of any said shared utilities, road and infrastructure costs for the Property shall be deducted from the Purchase Price referenced in the Contract at Closing.*

(Emphasis added). The language deducting a buyers' share of the infrastructure costs from the purchase price had not appeared in any of the previous offers for the Sellers' property. Actis requested that the Brokers insert the clause because Actis wanted to purchase the land with certain infrastructure already in place, and wanted a credit against the purchase price at closing if the Sellers had not installed the infrastructure by that time.

¶ 4 The Sellers rejected the offer and submitted a fully executed counteroffer. The counteroffer: (1) reduced the size of the property to be sold to 44.3 acres at a price of $5,790,822.60; and (2) included an option for Actis to purchase the remaining 4.98 acres at a higher price per square foot. The counteroffer did not, however, eliminate or alter the infrastructure credit provision. Actis accepted the counteroffer. A few months later, the parties entered into a second contract for the sale of the 4.98 acres included in the option. That contract also contained an infrastructure credit provision. In total, the stated purchase price for both parcels was $6,550,073.40.

¶ 5 Brent Wilson, a real estate broker employed by Gibbons–White (collectively the "Brokers"), brokered the real estate transaction between the Sellers and Actis. In negotiating the two contracts and subsequent amendments thereto, the Sellers were also represented by an attorney, Cameron Grant, and the law firm of Grant, Grant & Goiran, LLP (together, the "Lawyers"). Though Wilson and Grant were involved in the transaction from the start, neither of them informed the Sellers that their contracts with Actis contained the infrastructure credit provisions. Therefore, according to the Sellers, when the Sellers reviewed the draft settle-

ment statement one week before closing, they were surprised to learn that Actis would receive a $1,615,909.95 credit against the purchase price at closing for infrastructure costs. The Sellers, having been advised that they were legally obligated to complete the sale, closed as scheduled despite the $1,615,909.95 credit.

¶ 6 The Sellers then brought this action against the Brokers and the Lawyers asserting four claims for relief: (1) professional negligence by the Lawyers; (2) professional negligence by the Brokers; (3) negligent supervision by Lynda Gibbons, the employing broker of Gibbons–White; and (4) breach of fiduciary duty by the Brokers. Relevant to this appeal, the Sellers alleged that the Lawyers' and the Brokers' failures to timely advise them of the infrastructure credit provisions in the contracts constituted professional negligence. According to the Sellers, this negligence caused them to have to sell their land to Actis for $1.6 million less than what it was worth and what they had anticipated under the contracts.

¶ 7 After substantial discovery, the Brokers moved for summary judgment.[1] The Brokers asserted that the Sellers could not prove causation for the professional negligence and negligent supervision claims alleged against them. They also argued that any damages alleged by the Sellers were speculative as a matter of law, and that they owed no fiduciary duties to the Sellers as a matter of law.

¶ 8 The trial court granted the Brokers' motion for summary judgment as to all claims. The trial court ruled that: (1) the Sellers failed to establish a genuine issue of material fact as to causation because they did not present evidence that they would have sold the property to a specifically identifiable person or entity for $6.6 million but for the Brokers' negligence, and (2) the Brokers did not owe fiduciary duties to the Sellers because they acted as transaction brokers rather than as the Sellers' agents. The Brokers subsequently requested attorney fees and costs pursuant to their original listing agree-

ment with the Sellers. Finding that the Brokers were the prevailing parties in the litigation, the trial court awarded them attorney fees and costs.

¶ 9 The Sellers appealed. In a published, split decision, the court of appeals reversed the judgment of the trial court and remanded for a trial on the merits. *Ludlow v. Gibbons,* No. 10CA1719, —— P.3d ——, ——, ——, slip op. at 24, 31, 2011 WL 5436481 (Colo.App. Nov. 10, 2011) (selected for official publication). The court of appeals held that the Sellers met their burden of opposing summary judgment with respect to causation of damages by presenting genuine issues of material fact. *Id.* at 21–22. Specifically, the court of appeals held that the $6.6 million appraisal, along with the three unconsummated deals, and testimony from Actis's president that there was other interest in the property, sufficiently demonstrated a genuine issue of material fact as to the cause of damages. *Id.* at 22–24. The dissent disagreed with the majority's approach, and instead would have required either direct evidence of potential buyers at the $6.6 million price or expert testimony on the current market conditions or the likelihood of sale. *Id.* at 41 (Loeb, J., dissenting). According to the dissent, the appraisal alone failed to demonstrate causation of damages. *Id.* at 41–42 (Loeb, J., dissenting).

¶ 10 This Court granted certiorari to review whether a licensed professional can be liable for damages to a seller of real estate when, through the alleged negligence of the professional, the seller sells his property for less than its appraised value, in the absence of proof or any buyer willing to pay that higher amount.

## II. Standard of Review

¶ 11 Summary judgment is appropriate when the pleadings and supporting documents establish that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Ryder v. Mitchell,* 54 P.3d

---

1. The Lawyers also moved for summary judgment; however, the parties reached a settlement before the trial court ruled on that motion.

885, 889 (Colo.2002); *Roberts v. Holland & Hart*, 857 P.2d 492, 496 (Colo.App.1993). "The moving party has the burden of establishing the nonexistence of a material fact." *Roberts*, 857 P.2d at 496. When the nonmoving party has the burden of proof at trial, the party moving for summary judgment need only identify those portions of the record and affidavits which demonstrate an absence of a genuine issue of material fact. *Id.* If the non-moving party cannot produce enough evidence to establish a triable issue, then the moving party is entitled to summary judgment as a matter of law. *Id.*; *Luttgen v. Fischer*, 107 P.3d 1152, 1154 (Colo.App.2005). This Court reviews a trial court's order on a summary judgment motion de novo. *Ryder*, 54 P.3d at 889.

### III. Establishing Causation and the Fact of Damages in a Professional Negligence Claim Against a Broker

■ ¶ 12 To recover on a claim of professional negligence, the plaintiff must prove that the professional owed a duty of care to the plaintiff, that the professional breached the duty of care, that the breach proximately caused an injury to the plaintiff, and that damages resulted. *See United Blood Servs. v. Quintana*, 827 P.2d 509, 519 (Colo.1992); *City of Westminster v. Centric–Jones Constructors*, 100 P.3d 472, 485 (Colo.App.2003).

■ ¶ 13 The issue before the Court is whether the trial court properly granted summary judgment in favor of the Brokers on the basis that the Sellers could not prove causation. To determine whether the trial court should have granted summary judgment, the Court must consider how a plaintiff can prove causation in a professional negligence action against a transactional broker. While the issue of causation is ordinarily a question for the jury, when the "facts are undisputed and reasonable minds could draw but one inference from them, causation becomes a question of law for the court." *Allen v. Martin*, 203 P.3d 546, 566 (Colo.App. 2008); *Smith v. State Comp. Ins. Fund*, 749 P.2d 462, 464 (Colo.App.1987).

■ ¶ 14 In general, "to prove causation in a negligence case, the plaintiff must show by a preponderance of the evidence that the injury would not have occurred but for the defendant's negligent conduct." *Kaiser Found. Health Plan of Colo. v. Sharp*, 741 P.2d 714, 719 (Colo.1987). In a case such as this one, the alleged injury is economic damages. Thus, as a matter of law, to prove causation the plaintiff must be able to show that he in fact suffered economic damages. Colorado law has not yet addressed how a claimant can establish the fact of damages for causation in a claim for professional negligence against a transactional real estate broker. Despite the absence of law in this area, the similarities between the transactional brokerage and legal transactional practices render legal malpractice principles applicable in the transactional brokerage context.

■ ¶ 15 A professional negligence claim against a transactional broker arises where the plaintiff alleges a breach of a duty of care in handling the various pieces of an underlying real estate business transaction. For example, both transactional brokerage and legal transactional practices involve preparing documents for a business transaction. Both transactional brokerage and legal transactional practices also involve negotiating the terms of, and giving advice for, a business transaction. *See* § 12–61–101(2)(a), C.R.S. (2012) (defining "real estate broker"); § 12–61–802(6) (a transaction broker is "a broker who assists one or more parties throughout a contemplated real estate transaction with communication, interposition, advisement, negotiation, contract terms, and the closing of such real estate transaction"). Moreover, professional negligence claims against a transactional broker and legal malpractice claims both have at their core an underlying transaction that the plaintiff asserts resulted in a financial loss due to a breach of the professional's duty of care. On account of these similarities, we look to the legal malpractice framework to determine what constitutes the fact of damages for causation in a professional transactional broker malpractice action.[2]

---

**2.** Although we have not previously considered how a claimant must prove the fact of damages

for causation for transactional broker claims, Colorado courts have considered the fact of dam-

¶ 16 In a legal malpractice case, the plaintiff must prove causation by showing that the claim underlying the malpractice action would have been successful "but for" the attorney's negligence. *Bebo Const. Co. v. Mattox & O'Brien, P.C.,* 990 P.2d 78, 83 (Colo.1999); *Bristol Co. v. Osman,* 190 P.3d 752, 755 (Colo.App.2007). This is known as proving the "case within a case." *Bebo Const. Co.,* 990 P.2d at 83; *Bristol Co.,* 190 P.3d at 755. In cases involving an alleged unfavorable transaction, a plaintiff must show that he would have obtained a more favorable result in the underlying transaction but for the professional's negligence. *See Viner v. Sweet,* 117 Cal.App.4th 1218, 12 Cal.Rptr.3d 533, 538 (2004). The plaintiff may prove that he would have obtained a more favorable result in one of two ways: (1) by proving that he would have been able to obtain a better deal in the underlying transaction—the "better deal" scenario; or (2) that he would have been better off by walking away from the deal—the "no deal" scenario. *See id.* at 540, 542. Under either scenario, to sustain a claim for professional negligence, the plaintiff must prove that the professional's negligent acts or omissions caused the client to suffer some financial harm or loss.

¶ 17 We find this "case within a case" framework equally apropos in the professional malpractice against a transactional broker context and thus apply it here. Consistent with professional malpractice cases in Colorado, we hold that to sustain a professional malpractice claim against a transactional real estate broker, a plaintiff must show that, but for the alleged negligent acts of the broker, he either: (1) would have been able to obtain a better deal in the underlying transaction; or (2) would have been better off by walking away from the underlying transaction.

## A. "Better Deal" Application

¶ 18 To prevail on a motion for summary judgment, the defendants must show that the pleadings and supporting documents establish that there is no genuine issue as to any material fact. *Ryder,* 54 P.3d at 889; *Roberts,* 857 P.2d at 496. To establish causation in a claim for professional negligence against a transactional broker, like the claim at issue here, the plaintiffs would need evidence to show that, but for the transactional brokers' malpractice, they either: (1) would have been able to obtain a better deal in the underlying transaction; or (2) would have been better off by walking away from the underlying transaction. If no such evidence exists in the pleadings or supporting documents to establish a triable issue of fact, the defendants are entitled to summary judgment as a matter of law. *See Roberts,* 857 P.2d at 496.

¶ 19 The parties do not dispute that Actis would not have purchased the property for the contracted price of $6,597,215.50 without the infrastructure credit provisions. Actis's president's deposition testimony makes clear that Actis would only purchase the property with the infrastructure credit provisions, otherwise, he said, the property was too expensive for unserviced land. As such, the Sellers cannot show that they would have received a better deal with Actis in the underlying transaction but for the Brokers' malpractice. Thus, as a matter of law, the Sellers have not established the fact of damages for causation under the "better deal" theory.

## B. "No Deal" Application

¶ 20 Because the Sellers cannot establish the fact of damages for causation based on the "better deal" theory, the Sellers' ability to prove their "case within a case" hinges upon their ability to show that they would

ages for causation requirements for legal malpractice in which a plaintiff alleges that a professional breached a duty of care in handling the various pieces of an underlying business transaction. *SeeBebo Const. Co. v. Mattox & O'Brien, P.C.,* 990 P.2d 78, 80-82 (Colo.1999) (involving a claim for legal malpractice arising out of failed litigation); *Luttgen,* 107 P.3d at 1153-54 (involving a claim for legal malpractice arising out of

legal advice regarding real property); *Temple Hoyne Buell Found. v. Holland & Hart,* 851 P.2d 192, 194 (Colo.App.1992) (involving a claim for legal malpractice arising from a transaction which included a stock sale and option contract); *McCafferty v. Musat,* 817 P.2d 1039, 1040–44 (Colo.App.1991) (involving a claim for legal malpractice arising out of an allegedly premature settlement).

have obtained a more favorable result by foregoing the Actis deal. From the outset of this litigation, the Sellers have maintained that they would have been better off by walking away from the Actis deal and would have done so had they known about the infrastructure credit provision. The Sellers have, from the inception of this case, alleged that their economic injury—the fact of damages—is the foregone opportunity to sell their property for the additional $1.6 million that they anticipated they were going to receive in the Actis transaction.

¶ 21 From their complaint, through discovery, and in their motion for summary judgment, each of the Sellers' articulations of their injury amounts to the lost opportunity to sell their property for $6,600,000.[3] To the extent the Sellers state that they would have retained the property but for the Brokers' negligence, it is only so as not to sustain a loss in profits. Thus, the Sellers must present a genuine issue of material fact that they would have been better off walking away from the Actis deal—under the "no deal" scenario—because they would not have sustained the loss in profits allegedly caused by the Brokers' negligence. We accordingly examine whether there is a genuine issue of material fact that the Sellers lost profits as a result of the Brokers' negligence.

### 1. Lost Profits

¶ 22 When claiming lost profits as damages in a professional negligence case, a plaintiff must show either the amount of the profits that would have been earned or the fact that the plaintiff would have earned the profits. *See Republic Nat'l Life Ins. Co. v. Red Lion Homes, Inc.*, 704 F.2d 484, 489 (10th Cir.1983); *Roberts*, 857 P.2d at 496–97. "A claim for future profits may not be sustained by evidence which is speculative, remote, imaginary, or impossible of ascertainment." *Roberts*, 857 P.2d at 496–97 (citation omitted). The amount of damages need not be "established with mathematical certainty"; however, the fact of damage must be established and must be the tracable to, and the direct result of, the negligent act. *Id.* at 497 (citations omitted). "Documentary evidence of profit loss is preferred when practical. Damages can, however, be awarded based on undocumented testimony by the plaintiff or other witnesses." *Id.* (internal citations omitted). Nonetheless, the fact of damages cannot be based solely on speculations, guesses, or estimates. *Id.* Therefore, the fact that damages were sustained must be established beyond a mere possibility or speculation. *See Vanderbeek v. Vernon Corp.*, 50 P.3d 866, 874 (Colo.2002).

¶ 23 We find two Colorado cases particularly useful in examining what evidence is required to demonstrate lost profits, *Roberts*, 857 P.2d 492, and *Vanderbeek*, 50 P.3d 866. At issue in *Roberts*, 857 P.2d at 496, was whether a land developer could prove damages based on future profits. The plaintiff asserted that, but for an attorney's negli-

---

**3.** In their complaint, the Sellers allege that "[a]s a result of the ... negligence by []Brokers, [the Sellers] were required to close on the ACTIS Offer and the Option Contract at a combined purchase price of $1,615,909.95 less than [the Sellers] understood was provided by the ACTIS Offer and the Option Contract." The Sellers also allege that "due to the []Brokers' negligence, [the Sellers] became bound to the terms of the Additional Option which, when exercised, will result in another unexpected and detrimental reduction in the negotiated purchase price."

Similarly, in their C.R.C.P. 26 disclosures, the Sellers list their damages as $1,615,909.95 "which is the difference between the actual closing price of the Actis Offer and Option Contract, and what [the Sellers] believed they would receive under the purchase contract." This damages disclosure demonstrates that the Sellers' theory of damages rests upon their anticipated purchase price or lost profits.

Finally, in their opposition to summary judgment, the Sellers assert that they would not have sold the property to Actis if the Brokers had timely informed them of the infrastructure credit provisions. They also assert that the Brokers' negligence: (1) resulted in a sale of the property "for approximately $1.6 million less than its fair market value"; (2) "caused [the Sellers] to lose an asset for $1.6 million less than its fair market value"; (3) "contractually bound [the Sellers] to sell the property for less than its value"; (4) caused the Sellers to sell "an asset worth $6,600,000.00 for the gross price of $4,935,073.40, a loss of over $1,600,000"; (5) deprived the Sellers of the opportunity to "retain[] their [p]roperty worth $6,600,000.00 rather than selling the same for approximately $1.6 million less than its market value"; and (6) caused the Sellers to lose "the ability to retain the subject property without sustaining a forced loss on the purchase price."

gence in drafting the legal description of the land, the plaintiff would have been able to obtain financing to move forward with a development project. *Id.* at 495–96. He asserted that the measure of damages was a loss of future profits, and that only the amount of the loss was uncertain. *Id.* at 496. The court of appeals determined that a new business venture may assert a claim of lost net profits provided the claim is supported by "more than mere anticipation of starting a business, such as investment of time or money." *Id.* at 497 (citation omitted).

¶ 24 The court of appeals upheld the trial court's grant of summary judgment because the evidence of lost profits was speculative and was based on guesses and generalizations:

> [T]he record reveals that the entire project was too speculative in nature to warrant lost profits damages because the whole project was contingent upon finding a financier for an amount well above $17.5 million, and there is no evidence to suggest that such financing was available.... Without showing that a viable financier existed, the plaintiff did not submit any admissible evidence to contradict the motion for summary judgment. That is, he failed to present evidence indicating that, but for the negligence of the defendant, he probably would have sustained a profit.

*Id.* at 497–98. Consequently, the court of appeals held that the trial court properly granted partial summary judgment in the defendant's favor. *Id.* The plaintiffs did not raise a genuine issue of material fact on the issue of lost net profits because there was no credible evidence that the developer would have actually made any profit. *Id.*

¶ 25 In *Vanderbeek,* 50 P.3d at 874, this Court considered the plaintiff's claim of lost profits from the wrongful attachment of funds the plaintiff intended to use for stock investments. The plaintiff asserted that he planned to buy 200,000 shares of a particular stock, but for the defendant's wrongful attachment of funds. *Id.* The trading price of the stock increased while the funds were frozen and, once unfrozen, the shares cost considerably more per share. *Id.* As a result, the plaintiff could only afford to pur-

chase 95,000 shares. *Id.* The plaintiff brought claims for: (1) the loss associated with the increased amount he had to pay to acquire the 95,000 shares, and (2) the lost profits associated with the 105,000 shares he would have bought but for the frozen assets. *Id.* We held that the first category of damages was reasonably ascertainable, but the second was speculative and conjectural:

> Profits from a stock investment are not realized until the stock is sold at a higher price than that at which it was bought. These 105,000 shares of ... stock were neither bought nor sold. Thus unlike the increased cost [the plaintiff] actually paid to acquire the 95,000 shares of [stock], determining the profits [the plaintiff] could have realized had he purchased the 105,000 shares of [stock] the day after the earmarked funds were frozen is entirely dependent on an arbitrarily chosen "sell" date.

*Id.*

¶ 26 Thus, evidence of lost profits must be based on more than mere possibility or speculation. *See id.* With this in mind, we turn to whether the Sellers presented a genuine issue of material fact with respect to the fact of damages for causation—here, a genuine issue of material fact as to whether the Sellers lost profits.

### 2. The Sellers' Evidence of Lost Profits

¶ 27 The Sellers point to several pieces of evidence to support their claim that they lost profits by not walking away from the Actis deal. The Sellers have not, however, presented any actual evidence, whether in pleadings or other supporting documents, showing that they would have realized a sale price of $6.6 million on the property but for the Brokers' negligence.

¶ 28 First, the Sellers provided an affidavit from an appraiser who valued the property for the transaction at issue here. The appraiser "concluded the market value of the [p]roperty, in 'as is' condition, was $6,600,000" between February 23, 2007, and September 21, 2007. While this affidavit is sufficient to establish that the property was worth $6.6 million, the affidavit is not suffi-

cient to establish that the Sellers could have actually sold the property for $6.6 million but for the Brokers' negligence. The appraiser stated in his deposition that he could not determine whether the Sellers would have been able to find a willing buyer at that time, or what that buyer would have paid for the property.

¶ 29 Second, the Sellers highlight the three unconsummated deals over the previous seven years, arguing that these failed deals demonstrate a market for the land at the $6.6 million price. We are not persuaded that the previous unconsummated deals create a genuine issue of material fact that the Sellers could have avoided lost profits by walking away from the Actis transaction. The evidence does not establish that the previous prospective buyers were interested in the same 49–acre portion of the land that comprised the Actis deal. Additionally, each of the previous deals ultimately fell through; the Sellers did not offer any evidence showing that the previous potential buyers would have been interested in purchasing the property at the time of the Actis deal or thereafter, let alone at the price desired by the Sellers.

¶ 30 Third, the Sellers presented the deposition testimony of Actis's president who testified that, at the time Actis purchased the property, other potential buyers were interested in the property. While Actis's president testified at his deposition that he believed other potential buyers existed, he did not offer evidence of the price these potential buyers were willing to pay. Thus, this testimony fails to create a genuine issue of material fact that the Sellers lost profits by not walking away from the Actis deal.

■■■ ¶ 31 The Sellers also assert that they could have kept the property and sold it at some later date for a better profit. Such speculation is akin to the stock speculation in *Vanderbeek*. *See* 50 P.3d at 874. The Sellers did not offer any evidence that a future sale of the property would have been better or different than the actual sale of the prop-

erty to Actis. Thus, any damages based on this theory are mere speculation and consequently cannot establish the fact of damages for causation in this professional malpractice claim.

¶ 32 The Sellers' only argument that, but for the Brokers' negligence they would have received $6.6 million for the property, comes from the Sellers' speculation about what someone might have paid for the property in the future. The Sellers' assertions of lost profits, like the guesses and speculation about finding a financier for land development in *Roberts*, are contingent upon finding a buyer for the parcel at $6.6 million. *See* 857 P.2d at 496. The Sellers do not present any evidence that such a buyer was available or that the property could have garnered $6.6 million. The Sellers do not offer, for example, any expert testimony regarding the market conditions in the area at the time of the sale, or comparable sales in the area at the time, or any other evidence regarding the likelihood of a sale at a higher price than that paid by Actis, which could establish a genuine issue of material fact with respect to the fact of damages for causation and accordingly might overcome a motion for summary judgment. An appraisal of the market value of the property at the time of sale is insufficient to establish what the Sellers allege as their damages—that they should have and could have received $1.6 million more than they did for the property but for the Brokers' negligence.

¶ 33 Thus, even when drawing all inferences from this evidence in favor of the Sellers, and resolving all doubts against the Brokers, the Sellers' speculative evidence will not suffice to show the fact of damages for causation. Therefore, the trial court correctly granted summary judgment in favor of the Brokers on the professional negligence claim.[4] We hold, as a matter of law, that the Sellers have not put forth any evidence to create a genuine issue of material fact that the Brokers' professional negligence caused

4. The Sellers' claim of negligent supervision depends upon the claim for professional negligence. Absent damages under the professional negligence claim, the Sellers cannot sustain a claim for negligent supervision. Therefore, the trial court properly granted summary judgment on the negligent supervision claim as well.

damages to them. Accordingly, we reverse the judgment of the court of appeals.

## IV. Conclusion

¶ 34 We hold that to sustain a professional malpractice claim against a transactional real estate broker, a plaintiff must show that, but for the alleged negligent acts of the broker, he either: (1) would have been able to obtain a better deal in the underlying transaction; or (2) would have been better off by walking away from the underlying transaction.

¶ 35 Applying that framework to the case at hand, we hold that the Sellers fail to present evidence of the fact of damages because they do not establish beyond mere possibility or speculation that they suffered a financial loss because of the Brokers' professional negligence. Where, as here, the facts are undisputed and reasonable minds could draw but one inference from them, causation becomes a question of law for the court. *Allen*, 203 P.3d at 566. Because the Sellers have not provided any evidence other than impermissible speculation in support of their negligence claims against the Brokers, they cannot, as a matter of law, demonstrate that the Brokers' negligence caused them injury.

¶ 36 Accordingly, we reverse the judgment of the court of appeals with respect to the summary judgment on the professional malpractice claim and reinstate the judgment of the trial court including the attorneys' fees and costs associated with the claims.

Justice COATS dissents, and Justice HOBBS and Justice BOATRIGHT join in the dissent.

Justice COATS, dissenting.

¶ 37 Because I not only consider summary judgment against the sellers unjustified in the circumstances of this case, but also reject the majority's holding concerning professional malpractice claims against transactional real estate brokers generally, I respectfully dissent. I disagree with the majority's categorical pronouncement about the proof of broker malpractice claims both because I find it too broad for the majority's own rationale and because I believe the majority fails to recognize (or at least declines to acknowl-

edge) what I consider to be a meaningful distinction between lost profits from a negligently brokered transaction and the actual loss or diminution of a seller's property rights caused by the broker's negligence. In addition, even if I could agree that lost profits can be the only form of injury possible from malpractice by real estate brokers, I would still find the majority's measure of damages unrealistic and would, instead, consider a beneficial appraisal sufficient to evidence a genuine dispute of material fact as to both injury and damages.

¶ 38 Initially, I believe the majority simply misreads the allegations of the sellers' complaint. Rather than seeking $1.6M in lost profits from a negligently handled real estate transaction, the sellers seek damages for having to part with an asset, against their will, due to the negligence of the broker. As the court of appeals emphasized, the complaint alleged that as a result of the brokers' agreement to altered conditions of the transaction without the sellers consent, the sellers lost the opportunity "to avoid the contracts and corresponding losses," and "the ability to retain the subject property." By the same token, rather than alleging injury from "the foregone opportunity to sell their property for the additional 1.6 million that they anticipated they were going to receive in the Actis transaction," maj. op. 246, the sellers alleged that they were injured by being contractually forced to part with "an asset for $1.6 million less than its fair market value." I consider the difference significant both because the wrongful loss of a valuable property right amounts to an injury in and of itself and because damages for a lost asset are less speculative than for lost profits.

¶ 39 It is generally held that "[w]hen one is entitled to a judgment for ... the destruction or impairment of any legally protected interest in land or other thing, he may recover ... the value of the subject matter or of his interest in it at the time and place of the conversion, destruction, or impairment." Restatement (Second) of Torts § 927(1)(a) (1977). Although "value" can include both "market value and value to the owner," *id.* § 927 cmt. d, as the court of appeals noted, with detailed support, in cases involving dam-

age to property (including real property), the ordinary measure of damages is the diminution of the market value of the property. For obvious reasons, the mechanism typically used by courts to determine the market value of real property is the construction of a hypothetical market, based on sales of more or less comparable properties. *See generally* 1 Dan B. Dobbs, *Law of Remedies* § 3.5 (2d Ed. 1993). At least where a real estate broker's malpractice is alleged to have caused the wrongful deprivation of real property, I would therefore find an appraisal of that property to be a perfectly adequate method of evidencing a loss of value, and consequently, damages.

¶ 40 Under these circumstances, whether or not the majority's "better deal"/"no deal" dichotomy could fairly be said to present a false choice, it is at least clear that the majority's understanding of the second alternative as permitting recovery only upon a demonstration of a lost future, "better," sale is too narrow to account for the kind of injury allegedly caused by the broker malpractice claimed here. Even the foreign, split, intermediate appellate court decision from which the majority borrows its "better deal"/"no deal" analysis describes the latter option as merely requiring that the seller obtain a more favorable result by walking away from the deal. *See Viner v. Sweet,* 117 Cal.App.4th 1218, 12 Cal.Rptr.3d 533, 538 (2004) (splitting 2–1 over question whether seller was entitled to new trial to demonstrate that retaining stock would have had value as more than mere "corporate opportunity"). Because real property can have measurable value for a host of reasons other than merely resale at a profit, demonstrating a more favorable result by walking away cannot reasonably be limited to proof of an alternate profitable sale.

¶ 41 To the extent the majority misconstrues the allegations of the complaint in this case, the sellers are unjustly deprived of presenting their case for damages to a jury. Whether the majority misconstrues the allegations in this particular case or not, however, it is not difficult to envision real estate broker malpractice resulting in the loss of property a seller would have put to another beneficial use or simply enjoyed, rather than parting with it for the amount of the sale. To the extent the majority's sweeping pronouncement about the required showing for transactional real estate broker malpractice implies that a property owner can never show he would be better off by walking away from a sale except by producing evidence of lost profits from another, now foregone, sale, such a broad holding would clearly be both unnecessary for the resolution of this case, as it is understood by the majority, and unsupported by the majority's rationale.

¶ 42 Finally, even if lost profits really were the only kind of injury possible from real estate broker malpractice, to make survival of a motion for summary judgment contingent on the production of evidence of lost profits from another prospective sale equaling the claimed damages is not only unrealistic but an unjustified departure from existing law. Unlike the examples of speculative, remote, or imaginary evidence of future profits relied on by the majority, a hypothetical market for real property based on sales of more or less comparable properties constitutes a sufficient measure of damages for a multitude of legal purposes. *E.g., La Plata Elec. Ass'n v. Cummins,* 728 P.2d 696 (Colo. 1986) (using property appraisal to determine damages of easement condemnation); *Bd. of Cnty. Comm'rs v. Slovek,* 723 P.2d 1309, 1320 (Colo.1986) (appraisal constituted evidence of "diminution of the market value" for purposes of determining damages caused by a flood). Furthermore, while it may be necessary to demonstrate a genuine dispute about the cause of injury, surviving a motion for summary judgment has never been contingent upon producing evidence of the precise amount of claimed damages. *See, e.g., Julius Hyman & Co. v. Velsicol Corp.,* 123 Colo. 563, 623, 233 P.2d 977, 1008 (1951) ("[W]here it has been definitely established that damages are traceable to and the direct result of a wrong, the uncertainty as to the amount thereof is a question for determination by the trier of the facts."). Barring some unique circumstance, sales of real property based on appraisals of the kind offered by the sellers in this case are regular and expected occurrences. Even if real property were considered to have value only in the amount for

which it could be sold, I would find a valid appraisal based on comparable sales sufficient to establish a genuine dispute concerning the value of wrongfully divested property rights.

¶ 43 Because I not only believe that the sellers offered evidence sufficient to overcome the broker's motion for summary judgment in this particular case, but also that the majority's holding concerning the proof of malpractice claims against real estate brokers is far too broad for the circumstances and rationale from which it derives, I respectfully dissent.

I am authorized to state Justice HOBBS and Justice BOATRIGHT join in this dissent.