24CA1352 & 24CA1845 Wyss v Campbell 02-12-2026

COLORADO COURT OF APPEALS

Court of Appeals Nos. 24CA1352 & 24CA1845
Boulder County District Court No. 22CV30810
Honorable Elizabeth Beebe Volz, Judge

Daniel Wyss and Wendy Wyss,

Plaintiffs-Appellants,

v.

Timothy J. Campbell and Farmers Insurance Exchange,

Defendants-Appellees.

---

JUDGMENT AND ORDER AFFIRMED

Division I
Opinion by JUDGE MEIRINK
J. Jones and Taubman*, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced February 12, 2026

---

Levin Sitcoff PC, Bradley A. Levin, Jeremy A. Sitcoff, Susan Minamizono, Robyn Levin, Denver, Colorado, for Plaintiffs-Appellants

Freeman Mathis & Gary, LLP, Robert J. Zavaglia, Jr., Chayla A. Witherspoon, Denver, Colorado, for Defendant-Appellee Timothy J. Campbell

White and Steele, PC, Matthew A. Ralston, E. Catlynne Shadakofsky, Denver, Colorado, for Defendant-Appellee Farmers Insurance Exchange

Western Slope Law, Nelson A. Waneka, Glenwood Springs, Colorado, for Amicus Curiae Colorado Trial Lawyers Association

Sutton Booker P.C., Erica O. Payne, Katie B. Johnson, Denver, Colorado, for Amicus Curiae Colorado Defense Lawyers Association

Womble Bond Dickinson (US) LLP, Kendra N. Beckwith, Elizabeth Michaels, for Amici Curiae National Association of Mutual Insurance Companies and American Property Casualty Insurance Association

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2025.

¶ 1      In this case, seeking greater insurance payments after the December 2021 Marshall Fire[1] burned down their home, plaintiffs, Daniel and Wendy Wyss, appeal the district court's summary judgment in favor of defendants, Timothy Campbell and Farmers Insurance Exchange (Farmers).  The Wysses also appeal the court's order granting Farmers' request for an award of costs.  We affirm.

## I.      Background

### A.      Factual Background

¶ 2      The Wysses purchased their home in March 2021.  They reached out to Campbell, a Farmers' insurance agent who had helped procure insurance coverage on their prior home, to procure insurance coverage for their new home.  Campbell and the Wysses knew each other socially; they attended the same high school and events like Super Bowl parties, and the Wysses' daughter babysat for Campbell.

---

[1] The December 2021 Marshall Fire was the most destructive wildfire in Colorado history.  It caused 37,500 people to evacuate and destroyed more than 1,000 structures in Boulder County. Olivia Prentzel, David Gilbert & Thy Vo, *Marshall Fire Officially Becomes Colorado's Most Destructive, with 991 Homes & Businesses Burned, Officials Confirm*, Colo. Sun, https://perma.cc/68TX-2GGF.

¶ 3    Campbell visited the Wysses' new home to prepare an insurance application for their review.  He input information — including information publicly available from the county assessor's office — into Farmers' computer system to calculate coverage limits and premiums.  The assessor showed the house as having 1,724 square feet, which Campbell input into the insurance application.  The system required Campbell to differentiate between finished square footage and basement square footage.  The software calculated the limit values and their corresponding premiums for the available coverages within the policy.  Campbell sent the application to the Wysses for their review.

¶ 4    The application included information identifying the policy's coverage limits and extended coverage limits as follows:

| Coverage[2] | Coverage Limits |
|---|---|
| Coverage A – Dwelling | $698,000 |

---

[2] Only Coverages A and D are at issue in this case.  Coverage A represents the estimated cost to rebuild, and Coverage D applies to the costs of hotels, meals, and other incidentals if the Wysses were unable to live in their home after a covered loss.  And, though not at issue, Coverage B applies to detached structures, and Coverage C would cover the cost of personal property losses like furniture and clothing.

| Coverage[2] | Coverage Limits |
|---|---|
| Extended Replacement Cost | $174,500 (25%) |
| Coverage B – Separate Structure | $34,900 |
| Coverage C – Personal Property | $279,200 |
| Coverage D – Loss of Use | $139,600 (24 months) |

It also advised the Wysses:

- Farmers used an "estimating program to calculate a reconstruction cost estimate" for the home and that the estimate was "not a guarantee of reconstruction costs."

- The policy did "not provide Guaranteed Replacement Cost and coverage."

- The total square footage figure included all floors of the home but it noted, "IMPORTANT: The total square footage does NOT include . . . [the] basement (even if fully finished)."

- The Wysses must notify Farmers within sixty days of "any inaccuracy or change in any information" that they provided Farmers or that Farmers provided them "regarding the physical characteristics of the dwelling."

3

By signing, the applicant acknowledged "that the selected options and limits indicated in [the] application accurately reflect[ed] the coverage and limits options" and that the information entered in the application was true, correct, and complete to the best of the applicant's knowledge.

¶ 5    Daniel Wyss electronically signed the application, affirming that he had read the policy and understood its limitations. During his deposition, however, he stated that he had never read the materials provided to him before signing the application. Farmers issued the requested policy and sent it to Campbell who forwarded it to the Wysses, with instructions to direct any questions or corrections to Campbell. The Wysses did not ask Campbell any questions about the policy or ask him to make any changes. They also didn't contact Farmers to make any changes.

¶ 6    In December 2021, after the Marshall Fire burned down the Wysses' home, they submitted a claim to Farmers. Farmers paid the Wysses 100% of the coverage available under the policy, which

included $698,000 in dwelling coverage and twenty-four months of additional living expenses (ALE).[3]

¶ 7     In August 2022, Wendy Wyss emailed Farmers indicating that the Wysses had "revisited [their] policy and found a mistake in the square footage used to calculate [their] coverage," which might be why Farmer's "calculation of the price per square foot for rebuild seem[ed] above market." The Wysses explained that their policy incorrectly listed the home as having 1,724 square feet instead of 2,740 square feet — the higher number being consistent with an appraisal the Wysses had commissioned before they purchased their home and before they obtained the Farmers policy. They asked Farmers to reform the policy to reflect an increased square footage calculation "based on the actual square footage of [their] home," but Farmers declined because it was unable to identify any agency or underwriting errors in the policy. And "without evidence of a binding error taking place, [Farmers was] unable to retroactively alter [the] policy contract."

---

[3] Farmers didn't pay the Wysses the extended replacement cost coverage, but that's not at issue.

## B.    Procedural History

¶ 8    The Wysses sued Campbell in November 2022 for negligence and breach of fiduciary duty.  They also sued Farmers for reformation of policy; statutory denial of coverage in violation of sections 10-3-1115 and 10-3-1116, C.R.S. 2025; and breach of the duty of good faith and fair dealing.  Among other things, they alleged that they had obtained an estimate to rebuild their home for more than $1.75 million.  Campbell and Farmers separately moved for summary judgment.

¶ 9    In a thorough, combined order, the court granted summary judgment in favor of Campbell and Farmers.  The court concluded that Campbell was not negligent and that he did not breach any fiduciary duty.  With respect to Farmers, the court concluded that (1) the policy did not guarantee full replacement coverage and the Wysses were aware of the policy's limits; (2) there was no mutual mistake upon which reformation could be based; and (3) the Wysses could not sustain their claims for breach of the duty of good faith and fair dealing or their statutory bad faith claim because Farmers had timely paid 100% of the policy's benefits.

¶ 10    As the prevailing party, Farmers filed a bill of costs. The Wysses opposed, arguing that the charges of Farmers' construction cost estimating expert, Vertex Companies, LLC (Vertex), were unreasonable. The Wysses did not request a hearing. The district court awarded Farmers all requested costs, finding them reasonable.

¶ 11    The Wysses appealed the summary judgment and the costs order, and we later consolidated the appeals.

## II.    Analysis

¶ 12    The Wysses appeal the court's summary judgment in favor of Campbell and Farmers. They also appeal the court's award of costs to Farmers.

¶ 13    We review the district court's summary judgment de novo. *Gibbons v. Ludlow*, 2013 CO 49, ¶ 11. Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." C.R.C.P. 56(c); *Riccatone v. Colo. Choice Health Plans*, 2013 COA 133, ¶ 9.

## A.  The Court Did Not Err by Granting Summary Judgment in Campbell's Favor

¶ 14    The Wysses first argue that *Kaercher v. Sater*, 155 P.3d 437 (Colo. App. 2006), which discusses an insurance agent's duty of care, was wrongly decided.  Even if we disagree that *Kaercher* was incorrectly decided, the Wysses, nevertheless, contend that Campbell was negligent and breached his fiduciary duty because (1) he agreed to advise, guide, and direct the Wysses to insure their home and assumed a duty to procure sufficient coverage; (2) he held himself out as an insurance expert, thereby assuming additional duties to the Wysses; and (3) it was factually disputed whether he and the Wysses had a special relationship.  We decline to depart from *Kaercher*'s holding and disagree with the Wysses' remaining contentions.

### 1.  *Kaercher*

¶ 15    In *Kaercher*, another division of our court held that "insurance agents or brokers are not personal financial counselors and risk managers" and that they have "no continuing duty to advise, guide, or direct a client to obtain additional coverage."  155 P.3d at 441.  Instead, "[t]he general duty of the insurer's agent to the insured is

to refrain from affirmative fraud, not to watch out for all rights of the insured and inform the latter of them." *Id.* (citation omitted). *Kaercher* held that an insurance agent does not have a common law duty to ensure complete protection to the policyholder or recommend higher policy limits but must only exercise a reasonable duty of care. *Id.* at 440-41. Even when an agent represents that they are knowledgeable about insurance coverage and regularly during their business informs, counsels, and advises insureds about their insurance needs, the agent does not incur duties beyond those of the standard policyholder-insurance agent relationship. *Apodaca v. Allstate Ins. Co.*, 232 P.3d 253, 259 (Colo. App. 2009), *aff'd*, 255 P.3d 1099 (Colo. 2011).

¶ 16    The Wysses argue that the district court improperly relied on *Kaercher* and urge us not to follow it. While the district court recognized that agents owe customers a duty to "act with reasonable care," the Wysses contend that it did not address how Campbell met that standard. Instead of assessing Campbell's specific conduct, the court simply used *Kaercher* to conclude that Campbell did not have a continuing duty to advise, guide, or direct the Wysses to obtain additional coverage.

¶ 17    In addition to asserting that *Kaercher* was wrongly decided, the Wysses ask us to view insurance agents in the way some other courts do — as professionals with superior knowledge of business and insurance who must "exercise the skill and diligence fairly to be expected from one in his profession." *Butler v. Scott*, 417 F.2d 471, 473 (10th Cir. 1969) (applying New Mexico law); *see also Golden Rule Ins. Corp. v. Greenfield*, 786 F. Supp. 914, 916 (D. Colo. 1992) ("Where, as here, an insurance agent assists a person in completing an application, it is reasonably foreseeable that the applicant will rely on the agent's special knowledge and experience.").[4]

¶ 18    Next, the Wysses contend that, as a policy matter, *Kaercher* doesn't align with the expectations insureds have of licensed insurance agents who are more than just "data entry professionals." Specifically, they contend that agents who give insurance advice voluntarily assume a duty to procure sufficient coverage for the insured and should be responsible for the veracity and sufficiency of the advice. *Kaercher*, they argue, does not hold agents

---

[4] The Wysses rely on this case, which applies Colorado law, but it was decided before *Kaercher v. Sater*, 155 P.3d 437 (Colo. App. 2006).

accountable even "if their advice is faulty or the coverage is woefully insufficient."

¶ 19    The Wysses make an interesting argument, but it is based on case law from other courts and considerations of policy.  *Kaercher* is well reasoned, and we decline to depart from it.  *See Ryser v. Shelter Mut. Ins. Co.*, 2019 COA 88, ¶ 12 ("Although earlier decisions from divisions of this court are not binding on another division, 'the later division should give the prior decision some deference.'" (citation omitted)), *aff'd on other grounds*, 2021 CO 11.  In doing so, we follow the lead of other divisions of this court that have followed *Kaercher*.  *See, e.g., DC-10 Ent., LLC v. Manor Ins. Agency, Inc.*, 2013 COA 14, ¶ 20; *Apodaca*, 232 P.3d at 259.  We note that several other jurisdictions have also held that insurance agents do not have a common law duty to ensure complete protection to the policyholder or recommend higher policy limits.  *See, e.g., Webb v. Gittlen*, 174 P.3d 275, 279 (Ariz. 2008) ("[I]nsurance agents generally are not fiduciaries, but instead owe only a duty of 'reasonable care, skill, and diligence' in dealing with clients." (citation omitted)); *Gemini Ins. Co. v. Meyer Jabara Hotels LLC*, 231 A.3d 839, 853 (Pa. Super. Ct. 2020) ("[T]he general law is that

11

brokers do not have a duty to advise clients about their insurance needs."); *Go Wireless, LLC v. Md. Cas. Co.*, 2013 WI App 41, ¶ 38 (an insurance agent has a duty to exercise reasonable care, skill, and diligence in procuring coverage but does not have a duty to inform or recommend policy limits higher than those selected by the insured).

¶ 20    Likewise, it is "not up to the court[s] to make policy or to weigh policy." *Town of Telluride v. Lot Thirty-Four Venture, L.L.C.*, 3 P.3d 30, 38 (Colo. 2000).  If a heightened professional duty for insurance agents is desirable as a matter of public policy, the General Assembly may impose it.  But absent legislative action creating such an obligation, we decline to expand the common law duty of insurance agents beyond the parameters established in *Kaercher*.

2.    Campbell Did Not Assume a Heightened Professional Duty nor Was There a Special Relationship Between Campbell and the Wysses

¶ 21    Even if we agree with *Kaercher*'s holding, the Wysses argue that Campbell voluntarily assumed a heightened duty by holding himself out as an insurance expert.  And because he chose to advise the Wysses, they contend that Campbell must be responsible for the veracity and sufficiency of his professional advice.  They also

claim that summary judgment was inappropriate because the court never resolved whether they had a special relationship with Campbell. We disagree.[5]

### a. Applicable Law

¶ 22    Insurance agents have a duty to act with reasonable care toward their insureds, but absent a special relationship between the insured and the agent, the agent has no affirmative duty to advise the insured of possible additional coverage or provisions contained in the insurance policy. *Kaercher*, 155 P.3d at 441. Whether a special relationship has been formed turns on whether there is "entrustment" — that is, whether the agent or broker assumes additional responsibilities beyond those which attach to an ordinary, reasonable agent possessing normal competencies and skills. *Id.*

### b. Analysis

¶ 23    First, the Wysses contend that because Campbell — a licensed professional — voluntarily assumed a duty to advise and procure sufficient coverage, his actions should give rise to a heightened,

---

[5] Although the Wysses discuss these arguments separately in their briefs, because they are interrelated, we address them together.

legally enforceable professional duty.  *See P.W. v. Child.'s Hosp. Colo.*, 2016 CO 6, ¶ 21 ("In general, a party assumes another's duty of care and may be subject to liability for breaching that duty when the party voluntarily undertakes to render a service.").  Campbell assumed the responsibility of procuring insurance coverage for them by visiting the property to gather information; speaking to the Wysses about their expectations; reassuring them that "they would be covered for a total loss"; and knowing that the Wysses were "relatively uninformed about their insurance needs" and would rely extensively on Campbell to obtain proper coverage.

¶ 24     But the Wysses don't cite cases supporting their theory that an insurance agent's duty is heightened when that agent holds himself out as an expert and assumes an advisory role.  Indeed, our case law holds otherwise: "Even when an agent represents that he or she is knowledgeable about insurance coverages, and regularly in the course of . . . business, informs, counsels, and advises customers about their insurance needs, the agent does not incur duties beyond those of the standard policyholder-insurance agent relationship."  *Apodaca*, 232 P.3d at 259.  Simply put, in most circumstances, an insurance agent "does not have a duty to advise

of additional and available insurance coverages suitable for the customer's needs." *Id.* Thus, even if Campbell held himself out as an insurance expert, visited the Wysses at their home, and prepared an insurance application knowing that the Wysses would rely on his expertise, these allegations don't trigger a heightened professional duty.

¶ 25 Second, the Wysses contend that, based on their special relationship, Campbell owed them a heightened duty of care and that the court erred by granting summary judgment when factual disputes existed about such a relationship. As previously discussed, a special relationship is predicated on "entrustment," meaning whether the agent assumes additional responsibilities beyond those attached to an ordinary reasonable agent possessing normal competencies and skills. *Kaercher*, 155 P.3d at 441. The *Kaercher* division didn't list factors creating entrustment, but it cited some cases in which courts have discussed factors relevant to establishing entrustment. One such case identified the following factors:

- exercising broad discretion to service the insured's needs;

- counseling the insured concerning specialized insurance coverage;

- holding oneself out as a highly skilled insurance expert, coupled with the insured's reliance upon their expertise; and

- receiving compensation, above the customary premium paid, for expert advice provided.

*Parker v. State Farm Mut. Auto. Ins. Co.*, 630 N.E.2d 567, 570 (Ind. Ct. App. 1994). Unlike the circumstances here, those courts found entrustment when the insurance agent breached a professional standard of conduct; the agent agreed to obtain a specific type of coverage for the insured, but didn't; or the agent received a commission from the insured. *See, e.g., Bayly, Martin & Fay, Inc. v. Pete's Satire, Inc.*, 739 P.2d 239, 244 (Colo. 1987) (insurance agent acted negligently by failing to procure a particular type of available insurance coverage specifically requested by the insured and telling the insured that he was covered); *see also Bell v. O'Leary*, 744 F.2d 1370, 1372 (8th Cir. 1984) ("When an insurance broker agrees to obtain insurance for a client, with a view to earning a commission,

the broker becomes the client's agent and owes a duty to the client to act with reasonable care, skill, and diligence.").

¶ 26    The Wysses claim that their relationship with Campbell had the following "hallmarks" of entrustment:

- Campbell exercised broad discretion to serve the Wysses' needs by contacting their realtor to conduct a walkthrough of the property.

- Campbell had counseled the Wysses about their specific insurance needs for eight years, including insurance for classic cars and substantial past renovations.

- Because Campbell held himself out as a highly skilled insurance expert, the Wysses never questioned their policy or coverage.

- Campbell testified that he was a "kitchen table" agent who purposefully cultivated a relationship with his clients that went beyond the attention other agents would give their clients.

- The Wysses and Campbells knew each other personally; the Wysses' daughter babysat for Campbell; and the families

17

attended several of the same social events, including Super Bowl parties.

¶ 27 As noted, under *Kaercher*, holding oneself out as an insurance expert doesn't create a heightened standard. Likewise, familiarity does not transform an ordinary agent-insured relationship into a "special relationship" giving rise to enhanced obligations. Casual social contact, even if friendly or frequent, doesn't establish that Campbell undertook responsibilities beyond those inherent in the standard professional relationship.

¶ 28 The district court correctly determined that the question of a special relationship between the Wysses and Campbell didn't need to be submitted to a jury because nothing in his interactions with the Wysses suggested that Campbell had assumed responsibilities sufficient to create additional obligations. *See Karcher*, 155 P.3d at 441 (Whether a special relationship has been formed turns on whether the agent "assumes additional responsibilities beyond those which attach to an ordinary, reasonable agent."). When the Wysses purchased their home, Campbell acted like a normal insurance agent would — he visited the property to gather information and generate an insurance quote; used software that

calculated the appropriate coverage limits and corresponding premiums based on the property characteristics; and presented the application to the Wysses, explaining the proposed coverage and premiums. Because the district court correctly concluded, as a matter of law that, even considered in the light most favorable to the Wysses, insufficient evidence existed to demonstrate a special relationship, the district court properly resolved the issue on summary judgment.

### B. The Court Did Not Err by Granting Farmers' Summary Judgment Motion

#### 1. Standard of Review

¶ 29    As discussed above, we review a trial court's entry of summary judgment de novo. *Gibbons*, ¶ 11.

#### 2. Analysis

¶ 30    The Wysses argue that (1) the district court erred by requiring mutual mistake as a precondition to reform their insurance policy; (2) the prevalence of underinsurance is an industry-wide issue and Farmers cannot plead ignorance; and (3) the question whether Farmers acted in bad faith was a factual question for the jury. We address and reject each contention in turn.

### a. Reformation of Policy and Mutual Mistake

¶ 31 The Wysses argue that the court erred by requiring mutual mistake as a precondition for contract reformation. We disagree.

¶ 32 Reformation is an "equitable remedy by which a court will modify a written agreement to reflect the actual intent of the parties." Black's Law Dictionary 1535 (12th ed. 2024). Reformation is generally permitted when (1) both parties made a mutual mistake, or (2) one party made a unilateral mistake and the other engaged in fraud or inequitable conduct. *Poly Trucking, Inc. v. Concentra Health Servs., Inc.*, 93 P.3d 561, 563 (Colo. App. 2004). If a party's unilateral mistake is not the result of fraud or inequitable conduct but its own failure to use due diligence when reading the contract before signing it, however, that party will be held to the contract's terms. *Id.* Thus, contract reformation "is appropriate only when the instrument does not represent the true agreement of the parties and the purpose of reformation is to give effect to the parties' actual intentions." *Md. Cas. Co. v. Buckeye Gas Prods. Co.*, 797 P.2d 11, 13 (Colo. 1990). "The evidence must clearly and unequivocally show that reformation is appropriate under the circumstances." *Id.*

¶ 33    After consulting with Campbell, the Wysses submitted a signed application certifying that the information provided therein was true and accurate. Farmers then issued the policy. Even though the Wysses now assert that the policy contained mistakes and inaccuracies, the application specifically indicated that the policy did not provide guaranteed replacement cost coverage, the total square footage of the home did not include the basement (even if fully finished), the coverage amounts were estimates, and that the Wysses bore responsibility for ensuring the accuracy of the information submitted. The Wysses also stated that they did not review the application with Campbell, nor did they examine the policy before signing the contract. Our review of the record reflects that Farmers issued the policy based on the information that Campbell supplied and that the Wysses verified. The Wysses' belated realization of an alleged error in the policy, standing alone, does not support reformation.

b.      Prevalence of Underinsurance

¶ 34    The Wysses argue that the prevalence of underinsurance, based on the notion that insurance carriers are aware their policies

21

will not cover the cost to replace a home, is an industry-wide issue and that Farmers cannot plead ignorance.

¶ 35 To the extent that the Wysses contend that this entitles them to retroactively alter the terms of their policy, their argument implicates a broader policy determination that we decline to consider. *See Town of Telluride*, 3 P.3d at 38 (recognizing that it's "not up to the court[s] to make policy or to weigh policy").

### c. Bad Faith Claim

¶ 36 The Wysses argue that the court improperly concluded that their claims were precluded because Farmers paid 100% of their policy limits. We disagree.

¶ 37 An insurer must deal in good faith with its insured. *Am. Fam. Mut. Ins. Co. v. Allen*, 102 P.3d 333, 342 (Colo. 2004). In assessing a bad faith claim, the reasonableness of an insurer's conduct is measured objectively based on industry standards. *Id.* However, an insurance company does not have a duty to "ensure complete protection to the policyholder or to recommend higher policy limits, but only . . . to exercise a reasonable duty of care." *Apodaca*, 232 P.3d at 259.

¶ 38     Here, the Wysses argue that Farmers failed to reasonably investigate its own internal practices and whether its own conduct caused the Wysses' underinsurance.  The Wysses also maintain that Farmers refused to extend ALE benefits beyond twenty-four months, "despite a bulletin from Colorado legislators urging insurers to provide an additional 36 months of benefits," which violated section 10-3-1104(1)(h)(XIV), C.R.S. 2025.  We are not persuaded.

¶ 39     First, the policy established a coverage limit and didn't guarantee full replacement cost.  The policy's declarations clarified that Farmers' obligations extended only to the stated limit.  The Wysses had the opportunity to review the policy on multiple occasions but didn't.  They signed the relevant documents detailing their policy limits and acknowledged that they retained copies of those documents prior to the fire.  Thus, the Wysses were on notice of both the extent of and the limitations of the coverage they purchased.

¶ 40     Likewise, the Wysses also had the opportunity to evaluate and correct any discrepancy with the policy's estimated square footage, including the basement's omission.  The policy indicated that the

property's total square footage was 1,724, the square footage was an estimate and didn't include the basement (even if fully finished), and the Wysses should contact Farmers if they thought the estimates were inaccurate. The policy also advised that the estimate was a guide and didn't guarantee that the Wysses' home could be rebuilt for the estimated amount. The policy also noted that they could "insure [their] home for the estimated amount," or they could "select a different amount."

¶ 41 Further, after the fire, Farmers paid the Wysses their full policy limit within days of the total loss. Because Farmers promptly tendered the maximum reconstruction cost available under Coverage A of the policy and because the Wysses received the coverage for which they contracted, they have no basis to conclude that Farmers failed to honor its obligations.

¶ 42 Additionally, the Wysses' contention that Farmers was required to extend ALE coverage beyond the policy's express twenty-four-month limitation is unpersuasive. They rely on a legislative bulletin to suggest that coverage should have been extended to thirty-six months, but the bulletin was nonbinding and interpreted

24

a statutory amendment that became effective after the Marshall Fire and after the Wysses submitted their claim.

¶ 43    The Wysses contend that Farmers violated section 10-4-110.8(13)(c), C.R.S. 2025, and section 10-3-1104(1)(h)(XIV) by never explaining its refusal to extend ALE coverage. Neither statute applies. Section 10-4-110.8(13)(c) is triggered only when a policyholder experiences delays in obtaining necessary reconstruction permits and authorizes a policy amendment in that limited circumstance. Because no evidence shows that the Wysses encountered any permitting delay, the statute was never triggered. Section 10-3-1104(1)(h)(XIV) likewise provides no support because it applies only when an insurer denies a claim or rejects a compromise settlement. Here, Farmers did neither; it paid the full policy limits for the total loss and satisfied all obligations under the policy. Its refusal to retroactively expand coverage after the fire was not a claim denial but a decision to enforce the policy as written.

C.    Costs Awarded to Farmers

¶ 44    Finally, the Wysses argue that the court erred by awarding Farmers Vertex's fees for the time it spent investigating and creating

an expert report detailing the cost to rebuild the Wysses' home as it existed prior to the fire. We disagree.

### 1. Standard of Review and Applicable Law

¶ 45 We generally review an award of costs for an abuse of discretion and will disturb the award only if it is manifestly arbitrary, unreasonable, or unfair. *Archer v. Farmer Bros. Co.*, 90 P.3d 228, 230 (Colo. 2004). Section 13-16-105, C.R.S. 2025, provides that a prevailing defendant "shall have judgment to recover his costs against the plaintiff." Likewise, C.R.C.P. 54(d) provides that, "[e]xcept when express provision therefor is made either in a statute of this state or in these rules, reasonable costs shall be allowed as of course to the prevailing party."

¶ 46 A trial court must make sufficient findings so that, "when considered together with the record, this court can determine the basis for an award of costs." *Foster v. Phillips*, 6 P.3d 791, 796 (Colo. App. 1999). While it is best practice to make express findings, they may be implicit in the trial court's ruling. *Id.* "When the ruling, in the context of the record, is sufficient to determine its basis, and the record is sufficient to support the award, a failure to make express findings does not require reversal." *Id.*

## 2. Analysis

¶ 47    To support its claim for costs as the prevailing party, Farmers submitted a bill of costs. The bill of costs also included Vertex's invoice detailing the costs incurred during litigation. The Wysses did not request a hearing to challenge Farmers' factual assertions or to present additional evidence. While the Wysses challenged the validity of Vertex's charges, their response argued that three of Vertex's experts' charges were excessive and seemingly duplicative. The Wysses maintained that while there was only one designated expert, three additional individuals were included in the bill of costs without explanation. But the Wysses did not provide evidence supporting their claim, such as industry standards or a contradicting expert showing how the work was excessive or duplicative.

¶ 48    The trial court's order contained only two sentences: "While [the Wysses] objected to the reasonableness of costs associated with one of [Farmers'] experts, [the Wysses] did not request a hearing on the issue. The [c]ourt reviewed the material provided in support of the Costs and finds that they are reasonable and therefore enters

this award." The court then attached Farmers' proposed order granting the full $65,956.21 award.

¶ 49    On appeal, the Wysses repeat the argument made to the district court. Because Farmers' submissions established the reasonableness of the charges, the Wysses' objections, which were not supported by affidavits, expert testimony, or a request for an evidentiary hearing, were insufficient to overcome the presumption that Vertex's portion of the costs was properly awarded.

¶ 50    Although it would have been better practice for the district court to make specific findings, the record supports the award. *See Valentine v. Mountain States Mut. Cas. Co.*, 252 P.3d 1182, 1191 (Colo. App. 2011). Farmers submitted detailed invoices and affidavits documenting its costs. Implicit in the court's order is its conclusion that all the costs were necessary and reasonable. *See id.* We therefore discern no error with the court's award.

### III.    Disposition

¶ 51    We affirm the judgment and the order.

JUDGE J. JONES and JUDGE TAUBMAN concur.